[No. S021918. July 9, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR RICHARD PEREZ, Defendant and Appellant.

## Counsel

Howard C. Cohen, under appointment by the Supreme Court, for Defendant and Appellant.

Fern M. Laethem, State Public Defender, and William T. Lowe, Deputy State Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Harley D. Mayfield, Assistant Attorney General, Garrett Beaumont, Pat Zaharopoulos and Holly D. Wilkens, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**PANELLI, J.**—We granted review in this case after a divided Court of Appeal reduced defendant's first degree murder conviction to second degree murder for insufficient evidence of premeditation and deliberation. As explained hereafter, we conclude that the judgment of the Court of Appeal should be reversed.

### Facts

Defendant killed Victoria Mesa in her home in Garden Grove on the morning of September 30, 1988. There is no question that he was the

perpetrator. The only question is the circumstances under which the murder occurred—that is, whether it was premeditated and deliberate.

Michael Mesa, the victim's husband, testified that he left for work about 5:40 a.m. on the morning of the murder, while Victoria was still asleep. As part of their morning ritual he would leave her a note and call her before she left for work. Victoria was four months' pregnant, and Michael was concerned about her condition. This was to be their first child after years of unsuccessful attempts to have a child. In order to protect the pregnancy, Victoria's cervix had been sewn shut, and she could not have sexual relations. Michael called Victoria the morning of the murder about 7:35 a.m., before she left for work. She usually left for work around 8 a.m. He heard the sound of an automobile engine running in the background. The engine could have been his wife's car.

A neighbor who generally left for work at the same time as Victoria noticed Victoria's car in the driveway with exhaust coming from it. He also noticed that the front door to the house was open. The neighbor thought that it was about 8:05 a.m. when he drove by.

Victoria's employer called Michael about 9:45 a.m. to tell him that Victoria had not come to work. Michael called a neighbor to ask her to check on Victoria. The neighbor enlisted the aid of a gas company meter reader who, upon approaching the house, found the front door slightly ajar; he entered, found Victoria's body, and immediately left to call the police.

Police officers arrived about 9:50 a.m. and found Victoria's fully clothed body lying face down with her arms under her head in the bathroom and her legs extending into the hallway. A broken dish and dog food were lying near the body. A six-inch blade of a serrated steak knife was found under Victoria's head. A broken piece of knife handle was near her feet. The wood appeared to be the same as the handles of knives in the kitchen drawer. There was no sign of a forced entry, and the only unlocked door was the front door.

There was a large pool of blood beneath Victoria's body and splatters all over the adjacent walls and carpet. Blood was found in every room except the nursery. There were blood drippings throughout the floor of the master bedroom. Dresser drawers were open, and drops of blood were on the clothing inside the drawers. Jewelry boxes were open and had drops of blood inside. There was blood on the sink in the master bathroom. Four Band-Aid wrappers were lying on the counter; a folded Band-Aid saturated with blood was found in the entry of the master bedroom. A guest bedroom had bloodstains in the doorway of the room almost on a direct line with the light switch.

The entire kitchen was peppered with blood spots. There were drops of blood on the refrigerator and counter top and smeared blood around the handles of cupboards and drawers. Many of the cupboards and drawers were open. There were drops of blood inside some of the drawers, including one containing knives.

Victoria's purse was on top of a table in the kitchen. The contents of the purse were lying on the table. A removable car stereo was also on the table. All of the items had drops of blood on them.

The victim's husband found nothing missing from the house except for one of his dress shirts.

According to the pathologist who performed the autopsy, Victoria bled to death. She had sustained blunt force trauma to her eyes, nose and lips, probably from a fist. There were about 38 knife wounds, including 26 stab and slash wounds and 12 puncture wounds. There were deep stab and slash wounds about the head, face, and neck, in the carotid artery, around the spinal column, and on the back of the arms. There were defensive wounds on her forearms, wrists, and hands. The injuries to the front part of the body were inflicted before the injuries to the back of the body. Two different knives were used. Most of the wounds were inflicted by a single-blade knife consistent with the one found under the victim's body. Three wounds in the back were inflicted by a double-edged knife. These wounds appeared to have been inflicted after the victim was dead.

The only connection between defendant and the victim and her husband was that they had attended the same high school some 10 years earlier. Defendant had played sports with Michael Mesa. Defendant lived about two and a quarter miles away and would drive by the Mesa house about twice a week in the early evening and wave to Michael as the latter was working in the yard. Defendant's fingerprint was found on the wall in the hallway near the victim's body and on a bloody Band-Aid wrapper found in the master bathroom. Analysis of blood scrapings from the master bedroom, wall phone, kitchen floor, blood-soaked towel on the water cooler, and blood-soaked Band-Aid from the master bedroom revealed that they were consistent with 1 percent of the population, which includes defendant. To Michael Mesa's knowledge, defendant had never been in his house before.

Defendant's sister testified that he arrived home about 9 a.m. on the day of the murder. His hand was cut, and he was sweaty and pale. Defendant told her he had cut his hand on a saw. Defendant said he was going to drive to his father's jobsite. His sister offered to drive him, but defendant declined.

At 9:20 a.m. the same day, defendant was treated at a hospital emergency room for severe cuts on his right hand and smaller cuts on his left hand. Defendant told the nurse that he had cut himself with a Skil Saw. Based on her experience, the nurse did not believe that defendant's injury was the result of having been cut by a Skil Saw.

As a result of information learned from the hospital, police officers went to defendant's home that night. Defendant told the officers he had injured himself at a jobsite at a private residence in Anaheim while using a Skil Saw. Defendant was unable to show the officers where the jobsite was. Defendant's father produced for officers the shirt that Michael Mesa identified as the one missing from his house.

Defendant did not testify, and he made no statements about the offense. In argument, defense counsel challenged the sufficiency of the evidence of first degree murder and suggested that whoever killed Victoria had acted in a rage. The jury returned a verdict of guilty of first degree, premeditated and deliberate murder. As previously mentioned, a divided Court of Appeal reduced the conviction to second degree murder.

DISCUSSION

*Sufficiency of Evidence of Premeditation and Deliberation*

The People contend that the Court of Appeal erred in finding the evidence of premeditation and deliberation insufficient to support the judgment. Before proceeding to that question, we find it helpful to review the definition of premeditation and deliberation that was given to the jury, CALJIC No. 8.20, which we have found to be a correct statement of the law. (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1021 [245 Cal.Rptr. 185, 750 P.2d 1342].) CALJIC No. 8.20 defines premeditated and deliberate murder as follows:

"All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree.

"The word 'willful' as used in this instruction, means intentional.

"The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditated' means considered beforehand.

"If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of

deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.

"The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include[d] an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

"To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill."

■ Review on appeal of the sufficiency of the evidence supporting the finding of premeditated and deliberate murder involves consideration of the evidence presented and all logical inferences from that evidence in light of the legal definition of premeditation and deliberation that was previously set forth. Settled principles of appellate review require us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *Jackson* v. *Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574, 99 S.Ct. 2781].) The standard of review is the same in cases such as this where the People rely primarily on circumstantial evidence. (*People* v. *Bean* (1988) 46 Cal.3d 919, 932 [251 Cal.Rptr. 467, 760 P.2d 996].) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." (*Id.* at pp. 932-933, citations and internal quotation marks omitted.)

■ In challenging the Court of Appeal's reversal of the first degree murder conviction, the People argue that there is sufficient evidence to

support the jury's verdict of premeditated and deliberate murder under traditional standards of review and that the Court of Appeal majority misapplied *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942] in reaching a contrary determination. We agree.

In *People* v. *Anderson, supra,* 70 Cal.2d 15, this court surveyed a number of prior cases involving the sufficiency of the evidence to support findings of premeditation and deliberation. (*Id.* at p. 26.) ■ From the cases surveyed, the court distilled certain guidelines to aid reviewing courts in analyzing the sufficiency of the evidence to sustain findings of premeditation and deliberation. The *Anderson* analysis was intended only as a framework to aid in appellate review; it did not propose to define the elements of first degree murder or alter the substantive law of murder in any way. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 869-870 [277 Cal.Rptr. 122, 802 P.2d 906].) Nor did *Anderson* change the traditional standards of appellate review that we have set forth above. The *Anderson* guidelines are descriptive, not normative. (*People* v. *Thomas* (1992) 2 Cal.4th 489, 516-517 [7 Cal.Rptr.2d 199, 828 P.2d 101].) The goal of *Anderson* was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse. (*People* v. *Anderson, supra,* 70 Cal.2d at p. 27.)

In identifying categories of evidence bearing on premeditation and deliberation, *Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation. (*People* v. *Anderson, supra,* 70 Cal.2d at p. 27.) From the cases surveyed, the *Anderson* court identified three categories of evidence pertinent to the determination of premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing. Regarding these categories, *Anderson* stated: "Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Ibid.*) It is thus evident from the court's own words that it was attempting to do no more than catalog common factors that had occurred in prior cases. The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.

The Court of Appeal, in the lead opinion, while purporting to follow the *Anderson* analysis, failed to focus on the evidence presented and the possible inferences drawn therefrom, but instead reviewed the theories articulated in

the prosecutor's argument. It is elementary, however, that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury. Moreover, the argument was not entirely indicative of the prosecution's approach to the case because much of it was aimed at rebutting innuendo injected by the defense cross-examination and argument. When the lead opinion finally focused on the evidence presented, it refused to credit any inference advanced in support of motive or deliberate manner of killing. In so doing, the lead opinion did not so much misapply the *Anderson* factors as it did simply disregard settled principles of appellate review. ■ In effect, the lead opinion substituted its judgment for that of the jury. Even if we might have made contrary factual findings or drawn different inferences, we are not permitted to reverse the judgment if the circumstances reasonably justify those found by the jury. It is the jury, not the appellate court, that must be convinced beyond a reasonable doubt. Our task and responsibility is to determine whether that finding is supported by substantial evidence.

■ We now turn to that task. From the evidence presented, the jury reasonably could have inferred the following: Defendant surreptitiously entered the house while Victoria was warming up her car; there were no signs of forced entry or of the presence of an additional car. Defendant surprised her as she was carrying the dog food; the broken dog dish and dog food were strewn about the floor. Defendant first beat Victoria about the head and neck with his fists. Then he stabbed her with a steak knife obtained from the victim's kitchen; the handle and blade were consistent with knives in the kitchen drawer. When that knife broke, cutting him, defendant went in search of another knife; drippings of defendant's blood were found all over the kitchen, including a drawer containing knives. Regardless of defendant's motive for entering the house, once confronted by Victoria, who knew him and could identify him, he determined to kill her to avoid identification.

As so viewed, the evidence is sufficient to support the jury's findings of premeditation and deliberation. Evidence of planning activity is shown by the fact that defendant did not park his car in the victim's driveway, he surreptitiously entered the house, and he obtained a knife from the kitchen. (See *People* v. *Wharton* (1991) 53 Cal.3d 522, 546-548 [280 Cal.Rptr. 631, 809 P.2d 290]; *People* v. *Haskett* (1982) 30 Cal.3d 841, 849-850 [180 Cal.Rptr. 640, 640 P.2d 776].) As to motive, regardless of what inspired the initial entry and attack, it is reasonable to infer that defendant determined it was necessary to kill Victoria to prevent her from identifying him. (See *People* v. *Bonillas* (1989) 48 Cal.3d 757, 792 [257 Cal.Rptr. 895, 771 P.2d 844]; *People* v. *Alcala* (1984) 36 Cal.3d 604, 627 [205 Cal.Rptr. 775, 685 P.2d 1126]; *People* v. *Haskett, supra,* 30 Cal.3d at p. 850.) She was acquainted with him from high school and obviously would have been able to

identify him. The manner of killing is also indicative of premeditation and deliberation. The evidence of blood in the kitchen knife drawer supports an inference that defendant went to the kitchen in search of another knife after the steak knife broke. This action bears similarity to reloading a gun or using another gun when the first one has run out of ammunition.

Thus, though the evidence is admittedly not overwhelming, it is sufficient to sustain the jury's finding. As we have stated, the relevant question on appeal is not whether *we* are convinced beyond a reasonable doubt, but whether *any* rational trier of fact could have been persuaded beyond a reasonable doubt that defendant premeditated the murder. (See *People* v. *Wharton, supra,* 53 Cal.3d at p. 546; *People* v. *Lucero, supra,* 44 Cal.3d at p. 1020.) ■ We have previously observed that premeditation can occur in a brief period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." (*People* v. *Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7]; accord *People* v. *Kelly* (1990) 51 Cal.3d 931, 956 [275 Cal.Rptr. 160, 800 P.2d 516]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 87 [241 Cal.Rptr. 594, 744 P.2d 1127].)

■ Defendant challenges the strength of the inferences we have set forth, claiming that they are speculative and insubstantial. He asserts that it is speculative that the steak knife came from the kitchen. We disagree. Although one might think of other possibilities, the most reasonable inference is that the knife came from the kitchen, because it matched the kitchen knives and the victim's husband testified that he and Victoria were well-organized and kept everything in its place. (Cf. *Hemphill* v. *United States* (D.C. Cir. 1968) 402 F.2d 187, 190-191 [131 App.D.C. 46] [government could not close gap in proof by relying on assumption that people do not leave hammers lying around].) Defendant dismisses reliance on the use of the second knife by noting that the coroner's testimony indicated that the wounds inflicted by it were post mortem and in nonvital areas. There is no indication, however, that it would have been readily apparent, at the time of the assault, that the victim was already dead. She was knocked to the ground and lay bleeding to death; defendant would not have known the precise moment of death or which wound would cause it. Moreover, the jury could reasonably infer that the post mortem wounds were inflicted to make certain the victim was dead. Given that the post mortem wounds were inflicted after defendant had broken the first knife and used a second knife to inflict these wounds, it is difficult to characterize defendant's conduct as "mere rash and unconsidered impulse." Some period of time necessarily must have elapsed between the first and second set of wounds. While this conduct, in itself, may not necessarily support a finding of premeditation, in conjunction with

the manner of killing, it could easily have led the jury to infer premeditation and deliberation.

Additionally, the conduct of defendant *after* the stabbing, such as the search of dresser drawers, jewelry boxes, kitchen drawers and the changing of a Band-Aid on his bloody hand, would appear to be inconsistent with a state of mind that would have produced a rash, impulsive killing. Here, defendant did not immediately flee the scene. Again, while not sufficient in themselves to establish premeditation and deliberation, these are facts which a jury could reasonably consider in relation to the manner of killing.

Defendant also claims that the weight of the evidence in this case is more comparable to that in *People* v. *Anderson, supra,* 70 Cal.2d 15 than it is to that in *People* v. *Wharton, supra,* 53 Cal.3d 522.

In *People* v. *Anderson, supra,* 70 Cal.2d 15, the defendant lived with the family of the 10-year-old victim. He killed the victim in a brutal assault involving over 60 knife wounds all over the child's body. Although there was no question that defendant was the perpetrator, there were no eyewitnesses to the crime and there was no explanation of what led up to the murder. The defendant did not testify or confess. There was, however, evidence of the defendant's subsequent efforts to conceal the crime. On this record, our court concluded that the evidence was insufficient to demonstrate that the murder was premeditated or deliberate. We therefore reduced the conviction from first to second degree murder.

In *People* v. *Wharton, supra,* 53 Cal.3d 522, the defendant killed the woman with whom he had been living, stuffed her body in a barrel, and left it in the apartment. The autopsy revealed that the victim had been struck three times on the head with a blunt instrument, probably a hammer. A hammer was found hidden under a mattress, and the hammer was missing from a toolbox kept in the garage. The defendant confessed, claiming that he had killed the victim in an uncontrolled rage. On appeal, we found the evidence sufficient to support the jury's finding of premeditation and deliberation. The evidence indicated that the defendant either retrieved the hammer in advance to have it accessible in the event of an argument, or that the defendant became angry during the argument and went to the garage to obtain the hammer and kill the victim while she slept. Either version was sufficient to support planning activity. We also identified a plausible motive—the defendant was selling some of the victim's belongings. Though admitting that these were not the only inferences that could be drawn, we found the evidence of planning and motive sufficient despite the fact that the manner of killing was not in itself indicative of a preconceived design to kill. (*Id.* at p. 548.)

In our view, the evidence in the present case is more comparable to that in *People* v. *Wharton, supra,* 53 Cal.3d 522, than it is to that in *People* v. *Anderson, supra,* 70 Cal.2d 15. Defendant's obtaining of the steak knife from the kitchen is indicative of planning activity. A plausible motive is evident from the fact that the victim was acquainted with defendant. After defendant initially surprised and attacked Victoria, he then decided it was necessary to silence her to prevent her from identifying him. Finally, the manner of the killing is indicative of premeditation. Defendant went searching for another knife after the first knife broke. Even if the initial knifing was spontaneous, defendant had time to reflect upon his actions when the knife broke. That he went searching for another knife is indicative of a reasoned decision to kill. Thus, the evidence here is actually stronger than that in *Wharton.*

Accordingly, we conclude that the evidence is sufficient to sustain the jury's finding of premeditation and deliberation and that the judgment of the Court of Appeal should be reversed.

### *Failure to Instruct Sua Sponte*

The Court of Appeal's disposition had obviated the need to address the other contention that defendant had raised—namely, whether the trial court had erred in failing to instruct sua sponte on the provocation sufficient to reduce first degree murder to second degree (CALJIC No. 8.73). Our disposition, however, revives the necessity to address the claim. The court instructed on the provocation that would reduce a murder to voluntary manslaughter (CALJIC No. 8.42) at the request of the prosecution. The prosecution withdrew its request for CALJIC No. 8.73, and that instruction was not given. CALJIC No. 8.73 states: "When the evidence shows the existence of provocation that played a part in inducing the unlawful killing of a human being, but also shows that such provocation was not such as to reduce the homicide to manslaughter, and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree."

It is settled that a court must instruct on general principles of law that are closely and openly connected with the facts of the case. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].) The duty to instruct sua sponte on general principles encompasses the duty to instruct on defenses that are raised by the evidence, and on lesser included offenses when the evidence has raised a question as to whether all of the elements of the charged offense were present. (*Id.* at pp. 715-716.)

The evidence in the present case did not give rise to a duty to instruct sua sponte on the provocation that would reduce first degree murder to second

degree murder. There was no evidence of any provocation, reasonable or unreasonable. *People* v. *Valentine* (1946) 28 Cal.2d 121 [169 P.2d 1] does not help defendant because, unlike that case, there was no testimony whatsoever about the existence of a quarrel. The fact that the prosecutor requested a heat of passion instruction for manslaughter does not establish that the evidence would have necessitated a sua sponte instruction. Such instructions are commonly requested out of an abundance of caution.

CONCLUSION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.**—I dissent.

In the lead opinion in the Court of Appeal, Justice Crosby noted the existence of an "unspoken premise that if it is possible to construct a hypothesis, however flimsy and novel, to support a first degree murder conviction, the substantial evidence rule is satisfied." He immediately added: "That is not the law yet." Regrettably, to judge from the majority opinion, it is now.

I

Defendant was convicted on a jury's verdict of the first degree murder of Victoria Mesa under the theory of willful, deliberate, and premeditated murder, and was sentenced to prison for a term of 25 years to life.

By a vote of two to one, the Court of Appeal concluded that the evidence is insufficient to support the conviction because the record facts are inadequate to prove premeditation and deliberation beyond a reasonable doubt. It proceeded to modify and affirm the judgment by reducing the conviction to second degree murder and the sentence to 15 years to life.

The majority conclude that the evidence is, in fact, sufficient and reverse the judgment of the Court of Appeal.

I cannot agree. My reasons follow.

II

The facts are fully and correctly stated in Justice Crosby's opinion below.

"The victim, Victoria Mesa, lived with her husband of 11 years in a home in Garden Grove. He generally left for work several hours before she did, but

they typically had a phone conversation in the interim. Defendant was a high school acquaintance of the Mesas and also lived in the area. He waved as he drove by their residence as often as two to three times a week.

"Victoria's body was discovered at about 9 a.m. on September 30, 1988, by a gas company meter reader. He was enlisted by a neighbor the husband called when he could not reach his wife by telephone.

"The victim had been brutally stabbed to death in the hallway of her home. The crime scene yielded this evidence: Victoria's removable car stereo and purse, the contents dumped out, were on a glass table near the front door. There were droplets of blood on them. A broken dish and dry dog food littered the bathroom where a small dog was provisioned during the day. Victoria's body was positioned half in the bathroom and half in the hallway, face down, arms under her head. There was a large pool of blood beneath her body and splatters all over the adjacent walls and carpet. A broken steak knife blade was located near the victim's head, the handle in the hall.

"There were drops of blood on the kitchen floor and the cabinet knobs, and a bloody towel was there as well. A blood drop was found on a knife in a kitchen drawer.

"The dresser drawers in the master bedroom were open and had blood drops inside. Victoria's jewelry was dumped out of boxes which were spotted with blood, but her husband could not say any jewelry was missing.[1] The master bath yielded more blood and four bandaid wrappers. Defendant's prints were found on one of the wrappers and on a wall near the body (there was no evidence Perez had ever been in the home before). The blood in the hallway matched the victim's; in the other locations it was consistent with Perez's.

"The home, which was heavily secured and had two pitbulls in the backyard, had not been forcibly entered; only the front door was unlocked. The victim's car was in the driveway, keys in the ignition; and a neighbor's testimony suggested the vehicle was idling to warm up when he passed at about 8:15 a.m. on the cold morning of her death. He also noted the front door of the house was ajar at that time.

"Perez did not testify and does not attack the sufficiency of the evidence to prove he was the killer. Consequently, there is no reason to discuss his

---

[1]It is noted here that "Apart from bandaids, the only item known to have been taken was one of the husband's shirts. It was recovered, with the assistance of Perez's family, from the place defendant had taken it."

version of the events in any detail, except to note the following: Perez told a story to a nurse and later to police investigators that was incredible in light of the known facts.

"At about 9:20 a.m., defendant appeared for treatment at Fountain Valley Community Hospital, complaining of an injury to his hand from an electric saw in a jobsite accident (a claim maintained with the police to the point of leading them on a wild goose chase to a nonexistent project). He had a deep cut on the fifth finger of his right hand and a smaller one on the inside of the fourth finger. These wounds were clean, unlike any Skil Saw injuries an experienced emergency room nurse had ever seen. A knuckle of his left hand was also nicked.

"The pathologist said Victoria suffered 26 stab wounds, although none to vital organs. There were a dozen or so puncture wounds. The cause of death was loss of blood from a cut to the carotid artery. The victim also had 12 abrasions and contusions to the face and stomach, indicating she had been beaten with fists or the equivalent. She was struck on the back of her arms and forearms after she expired. The doctor also expressed the opinion that three wounds in the back were from a double-bladed knife, unlike the weapon used to inflict the other injuries.

"This was not overtly prosecuted as a felony murder.[2] But, because the prosecutor made much of it in his closing arguments, we also relate the following: The victim was pregnant. She had been artificially inseminated because the Mesas had been unable to have children and elected this alternative. Neither her husband nor the defendant would have been the natural father. Also, the pregnancy was precarious. Certain medical precautions had been taken, and the victim could not have sexual relations. In addition, Victoria, according to her husband, was a feisty person, who would have resisted an intrusion of her home or person. Larded throughout the deputy district attorney's arguments to the jury was the suggestion that the victim died defending her honor from a crazed rapist who had coveted her since high school and had to eliminate her as a witness after she spurned his advances."[3]

---

[2]It is noted here that "neither the trial prosecutor nor the deputy attorney general ever advanced [the] claim" that "the victim was killed during an interrupted burglary. . . . And, of course, the jury was not instructed on the felony-murder rule. . . ."

[3]At another point, it is noted that "The theory . . . that this was an unprovoked surprise attack . . . was never suggested to the jury by the trial prosecutor or even by the Attorney General here. [Nothing can be offered] to support it, except a broken dog dish that was

## III

In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781], italics in original.) "[W]e must ask the same question when we conduct such review under the due process clause of article I, section 15 of the California Constitution." (*People* v. *Thomas* (1992) 2 Cal.4th 489, 544 [7 Cal.Rptr.2d 199, 828 P.2d 101] (conc. & dis. opn. of Mosk, J.).)

The following principles are applicable to sufficiency-of-evidence analysis under both the federal and state charters.

"The evidence that we view is the evidence *in its entirety*. In other words, although we weigh the facts in favor of the People's position, we do not weigh only such facts as are favorable thereto. '[W]e must resolve the issue in the light of the *whole record*—i.e., the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by' the People on appeal.

"To be sufficient, evidence must of course be substantial. It is such only if it ' "reasonably inspires confidence and is of 'solid value.' " ' " By definition, 'substantial evidence' requires *evidence* and not mere speculation. In any given case, one 'may *speculate* about any number of scenarios that may have occurred . . . . A reasonable inference, however, may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.'

"Further, the evidence must be capable of supporting a finding as to every fact required for conviction *beyond a reasonable doubt*. Any such doubt

---

ordinarily located just where it was found and the time of day. [Such] speculation would have a logical basis if the dish had been discovered in the same condition elsewhere in the home. Situated in the usual location, however, it proves nothing. It could as easily have been kicked over in the struggle as dropped by the victim. The significance of the hour of the encounter . . . was an essentially neutral factor in light of all the unknowns present here."

At yet another point, it is noted that there is a "question of who brought the kitchen knife to the scene of the crime, the defendant or the victim? There is, of course, no way of knowing . . . . [¶] The same is true of the second knife. [It may perhaps be] argue[d] defendant either brought it with him or obtained it from the kitchen to finish off the victim. Maybe, but who knows? And, if he did bring it in the form of a knife he ordinarily carried during working hours, what does that prove about premeditation?"

must, of course, be 'reasonable'—but nothing more. It plainly need not be 'grave' or even 'substantial.' What is required, in a word, is 'near certainty' or 'evidentiary certainty[.]' " (*People* v. *Thomas, supra,* 2 Cal.4th at pp. 544-545 (conc. & dis. opn. of Mosk, J.), italics in original and citations omitted.)

Manifestly, "[a] state-court conviction that is not supported by sufficient evidence violates the due process clause of the Fourteenth Amendment and is invalid for that reason. . . . [A] California conviction without adequate support separately and independently offends, and falls under, the due process clause of article I, section 15." (*People* v. *Thomas, supra,* 2 Cal.4th at p. 545 (conc. & dis. opn. of Mosk, J.), citation omitted.)

## IV

I turn to the issue whether the evidence is sufficient to support defendant's conviction for willful, deliberate, and premeditated murder.

The specific question concerns the elements of premeditation and deliberation—or strictly, premeditated and deliberate intent to kill.

Traditionally, "premeditated" has been defined as "on preexisting reflection," and "deliberate" as "resulting from careful thought and weighing of considerations." (See generally *People* v. *Anderson* (1968) 70 Cal.2d 15, 26 [73 Cal.Rptr. 550, 447 P.2d 942], and cases cited.) The terms have been further defined by their antonyms: "premeditated" is not "spontaneous"; and "deliberate" is not "hasty," "impetuous," "rash," or "impulsive." (See generally *People* v. *Hilton* (1946) 29 Cal.2d 217, 222 [174 P.2d 5]; *People* v. *Thomas* (1945) 25 Cal.2d 880, 901 [156 P.2d 7].)

In *People* v. *Anderson, supra,* 70 Cal.2d 15, we stated in pertinent part as follows.

"The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of

considerations' rather than 'mere unconsidered or rash impulse hastily executed'; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People* v. *Anderson, supra,* 70 Cal.2d at pp. 26-27, italics in original and citation omitted.)

From the very day we decided *Anderson,* we have construed its language to be normative as well as descriptive. The rule is this: the evidence is sufficient as to premeditation and deliberation if and only if there is (1) evidence of planning *and* motive *and* manner; or (2) extremely strong evidence of planning; or (3) evidence of motive *and* either planning *or* manner.

In *Anderson,* we also observed that "It is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation. 'If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations.' " (70 Cal.2d at pp. 24-25.)

The analysis set out in Justice Crosby's opinion below is faithful to the governing legal principles and also takes account of the record as a whole and in its details. That discussion is as follows.

". . . [In *Anderson,*] the Supreme Court found the evidence of premeditation insufficient on facts remarkably similar to ours. (Eerily, the victims even shared the same first name.) The prosecution presented evidence of a brutal, frenzied knife attack: 'Over 60 wounds, both severe and superficial, were found on Victoria's body. The cuts extended over her entire body, including one extending from the rectum through the vagina, and the partial cutting off of her tongue. Several of the wounds, including the vaginal lacerations, were post mortem. No evidence of spermatozoa was found in the victim, on her panties, or on the bed next to which she was found.' " (Quoting *People* v. *Anderson, supra,* 70 Cal.2d at pp. 21-22, and omitting fn.)

"Turning to the facts of the present case, we examine the prosecutor's closing arguments to the jury; for, if there is an explanation for a finding of

premeditation, it should be there.[4] First, the deputy district attorney essentially conceded there was no evidence of motive, pointedly paraphrasing CALJIC No. 2.51 to the jury: 'Motive is not an element of the crime that need be proved specifically; however, you may consider motive to do a crime, or lack of motive to do a crime, as it reflects on the evidence.'

"The prosecutor urged the following hypotheses in support of a finding of premeditation: '[I]n this case . . . though we don't know with a hundred percent accuracy the why—and remember we talked about that in jury selection—absent Vickie Mesa, we'll never know. The point is, but there are some facts from which [we] can deduce theories. I'm not talking about wild speculation[;] I'm talking about theories. We know this, that the defendant knew the Perezes [*sic*] since high school. . . . You are going to see a picture of Vickie. Vickie is there next to Mike Mesa. She was a very pretty girl. This was a few weeks before the killing. Remember this is the shirt he is wearing. This is at the wedding and you will get a chance to see Vickie Mesa. She was popular. She was pretty.'

"To this point the prosecutor essentially conceded the evidence revealed no motive,[5] recalled the victim and defendant were acquainted (the victim in *Anderson* was the daughter of the defendant's paramour), and noted she was attractive. None of this helped to prove premeditation, of course.

"Next, the deputy district attorney claimed, 'We know this: That the defendant Perez, whether he says he was driving by there on his way home, maybe he took that route for that reason, maybe he did not. But the point is that he had more than ample opportunity to go by that house on several occasions and know the m.o. . . . But this guy knew it because it is clear that defendant Perez went to that house when he knew that Mike Mesa was not there. For some reason he wanted into that house without Mike Mesa around. I don't think that it was to solicit . . . Amway or anything like that. It was for some diabolical purpose.'

"The conclusion the deputy district attorney drew from these meager facts was sheer speculation. The evidence does support the notion that defendant

---

[4]It is noted here that "In *People v. Wharton* [(1991)] [53] Cal.3d [522] [280 Cal.Rptr. 631, 809 P.2d 290], a majority of the Supreme Court looked to the prosecutor's theory to test the viability of the premeditation evidence under *Anderson*. It concluded on somewhat similar facts that the jury could have believed the possible murder weapon, a hammer, was either brought in from the garage in advance or retrieved with the intent to kill during an altercation in a home. *Wharton* is distinguishable from the present [case] in a number of ways, however, as will be discussed below."

[5]It is noted here that "Later [the prosecutor] suggested the motive might be to eliminate the victim as a witness . . . . This begs the question, of course. The desire to eliminate a witness only shows intent to kill, *unless* there is evidence to suggest it was entertained before the fatal attack. Any other rule would bootstrap a serious number of garden variety second degree murder cases into firsts." (Italics in original.)

picked a time to encounter the victim when her husband was gone. But there is exactly no basis for the claim that 'some diabolical purpose' was involved in that. In *Anderson*, too, the defendant killed the victim when they were alone.

"The prosecutor next turned to the possibility that the victim and defendant had some sort of ongoing relationship unknown to her husband. Although there was little evidence one way or another on that subject,[6] the deputy district attorney argued, 'Even if there—assuming that in your wildest dreams there were [an affair between them], this crime is still murder. But ladies and gentlemen, I'll tell you right now, there wasn't.' There was nothing to base that assertion on; but the prosecutor pressed on to new heights of speculation: 'The point is whether it is an obsession that he carried with him for 10 years since high school, a torch, whether it was some need, desire. He had a desire to see her and confront her. He got in that house when Mike Mesa was gone.' Aside from these naked assertions, nothing in the record indicates Perez had either an obsession or plan to confront the victim for some improper purpose.

"After citing one item of actual evidence, the victim's present inability to engage in intercourse, the prosecutor let his imagination take flight again, tossing in a pinch of personal invective as well: 'What is Vickie Mesa going to do if she even suspects some kind of an assault or desire for physical relations? She is going [to] fight this guy. She probably did give a run for the money. Unfortunately, this is a big man. This is a big dangerous man. You saw what he did there. Anybody who can do that kind of act that is a monster.[7] That poor woman, whether she let him in under the guise of the phone, or some reason, or whether or not he snuck in that door because it was unlocked at the time she left the car running and confronted her. Here she is thrust in the arms of this thing. I suggest you to [*sic*] ladies and gentlemen nobody should have to be subjected to this and you will see the photos and it is terrible.' None of this demonstrated planning or motive.

"After several paragraphs of gory description of the victim's injuries, the deputy district attorney made the only supportable argument he had which met one of the *Anderson* tests, the manner of the killing: 'And you can imagine the perpetrator of this crime as he is thrusting that knife. He is

---

[6]It is noted here that "The victim's husband was not aware of any relationship between the killer and his wife. But Perez did manage to enter their home, probably when she was present. (It is, of course, possible that she left for work and returned to carry out some forgotten task.) The circumstances of the entry are one of the mysteries shrouding this case."

[7]It is noted here that "In rebuttal argument, the prosecutor added the following: 'If he was a stand-up guy he would have taken his medicine and been honest with the cops. But he is not. He is a coward. He is the same kind of coward that would do what he did to a woman.' "

taking that knife. He is penetrating the skin. He is penetrating the tissue. Going through the veins. Through the arteries. Hitting bone. Touching up against the organs. Having to pull that out again. And you can imagine the suction or the type of resistance that you get when you pull the knife out again. You do that 38 times on somebody.' The defendant in *Anderson* did it 60 times, of course. The wounds inflicted here were numerous; some were deep. They may have shown an intent to kill, but they did not demonstrate premeditation. No vital organs were hit in the places the victim was stabbed; she died because a cut on the neck nicked the carotid artery. One would think a *planned* homicide with a knife against a physically overmatched female would have been carried out in a more decisive and less frenzied fashion— and without injury to the perpetrator.

"The prosecutor contended, 'Do you think that you know what you are doing? Do you think that at some point after that beating and after that knife broke that Mr. Perez said to himself, "Hey this woman can identify me?" Not only that her[ ] husband will kill me. He knew the husband—you saw Mike Mesa. She has got to die. And he stabbed and he stabbed and he stabbed until she quit bleeding. And he stabbed to make sure that she would not be able to whisper one word of breath, because he had to kill her.' The defendant in *Anderson* lived in the victim's home, of course, and had a similar reason to avoid identification. This was not considered motive evidence in *Anderson*. (The prosecutor's argument that defendant would have feared retaliation from Mesa is sheer hyperbole, obviously, since it is based on the improbable assumption that Perez might think the grieving husband would solve the murder and find him before the police did.)

"Concluding this part of his argument, the prosecutor said, 'Let's assume that when he went in that house he did not have an intent to kill. [There was, of course, no evidence to suggest he did have such an intent at that time.] . . . [A]fter he beating [*sic*] her and after he had stabbed [her] nearly a dozen times he knew that it had to be finished. And in that short period of time Mr. Perez arrived at a cold, calculated, judgment. He made that decision that she had to die.' Again, the same could be said for the defendant in *Anderson*.

"In short, the trial prosecutor based his argument for a first degree finding on the savagery of the attack, plus liberal doses of venom, personal revulsion against defendant and his act, and unalloyed speculation.[8] Only the nature

---

[8]It is noted here that ". . . The prosecutor did a fine job; he accomplished more than he had a right to. The problem is the 'hard evidence' of premeditation was not presented, as the deputy district attorney's own argument demonstrates. Our role is to correct such mistakes,

of the assault comes near to meeting the *Anderson* tests; and, as previously noted, the rule has been repeatedly reiterated by our Supreme Court that '[t]he fact that a slaying was unusually brutal, or involved multiple wounds, cannot alone support a determination of premeditation. Absent other evidence, a brutal manner of killing is as consistent with a sudden, random "explosion" of violence as with calculated murder.'[9] (*People* v. *Alcala* (1984) 36 Cal.3d 604, 626 [205 Cal.Rptr. 775, 685 P.2d 1126]; see also *People* v. *Turner* (1990) 50 Cal.3d 668, 688, fn. 4 [268 Cal.Rptr. 706, 789 P.2d 887].) Here we have exactly that: a brutal murder, standing alone.[10]

"The Attorney General's efforts to avoid *Anderson* are not persuasive: 'In this case the overwhelming evidence of "manner of killing" fully supports the jury's verdict of first degree murder.' As has already been emphasized several times, that is not enough where the evidence only shows a brutal and vicious, but unexplained, assault. Nevertheless, the Attorney General plugs on, suggesting the motive was 'to eliminate a witness to appellant's entry

---

and *People* v. *Wharton, supra,* [53] Cal.3d at [pages 547-548,] makes it perfectly clear that the prosecution theory is the first place to look in the analysis."

[9]It is noted here that "The 'second knife theory' (i.e., that Perez went to the kitchen for a second knife after the first broke, thus demonstrating planning) proposed by the Attorney General . . . was *not* argued by the deputy district attorney. This is what he said on *that* subject: 'There is one ironic piece of evidence, here, ladies and gentlemen, from all the evidence that you heard you never heard a description of a double-edged blade that was found. [¶] All they found in [the] kitchens [*sic*], in the kitchen were steak knives. There hidden away in the closet was a survival knife with no blood on it. What does that suggest to you, ladies and gentlemen? That maybe Mr. Perez went into that house, had a double-edged blade with him? Who knows what happened. Maybe, again, if you want to engage in inspection [*sic*], did poor Vickie Mesa try and grab something like a steak knife to defend herself when it was too late?' " (Italics and bracketed material in original.)

[10]It is noted here that "To be sure, the prosecutor made much of defendant's behavior after the crime to attempt to convince the jury that it was premeditated. But post-crime behavior is simply irrelevant according to *Anderson*, and previous Supreme Court opinions, for this purpose: 'Finally, the defendant in [*People* v.] *Granados* [(1957) 49 Cal.2d 490] . . . attempted to "cover up" the crime by lying to the brother and the mother of the victim. Although this type of evidence may possibly bear on defendant's state of mind *after* the killing, it is irrelevant to ascertaining defendant's state of mind immediately prior to, or during, the killing. Evasive conduct shows fear: it cannot support the double inference that defendant planned to hide his crime at the time he committed it and that therefore defendant committed the crime with premeditation and deliberation.' (*People* v. *Anderson, supra,* 70 Cal.2d at p. 32.) The deputy district attorney here, however, argued precisely that: 'You know, we can infer from somebody's actions right after a crime what type of state of mind they had.' Notwithstanding *Anderson*, the prosecutor's point can have merit, depending on the type of after-the-fact evidence involved. (See discussion, *infra*.) As will be explained, however, the evidence presented in this case was not the kind which would assist in differentiating degrees of murder." (Italics and bracketed material in original, except for "(1957).")

into the Mesa home.' The deputy district attorney did not make that argument, probably because there was no evidence at all that Perez entered unlawfully or uninvited.[11]

"There was some evidence that the wounds in the victim's back were inflicted as she lay dead or dying. This *is* consistent with an intent to kill; but, as *Anderson* teaches, it tells us little or nothing about premeditation.[12]

"The deputy attorney general claims, '[defendant] had never been inside that home before.' But the prosecutor produced no one who could testify to *that*. And, even assuming she is right, no logical inference can be drawn of a premeditated design to slay the victim based on it.

"We are next told the victim was an attractive woman and '[t]he evidence suggests that appellant may have been obsessed with Victoria based on his driving by her home frequently in the months preceding the murder.' But there was no proof that defendant, who apparently lived nearby, was not using a convenient route to come and go. The obsession argument is also based on the finding of blood on a high school memento in the Mesa home. The difficulty, of course, is that blood was found virtually *everywhere*. It would have been more unusual, perhaps, if the high school memento had not 'drawn' blood.

"The Attorney General suggests the victim was killed because defendant would not want it known that he had abused a pregnant woman. This is another speculation without a factual predicate. She was pregnant, but there was no proof Perez was aware of that.

"Then there is the second knife theory (*ante*, fns. [3], [9]) . . . . The argument goes this way: The kitchen knife broke during a struggle. Therefore, Perez retrieved a second knife. This was premeditation, 'the functional equivalent of reloading a gun.' Could be, but there is nothing to support the theory other than the pathologist's opinion that two knives were involved because some of the cuts were inflicted by a double-edged blade, although

---

[11]It is noted here that there is no "significance in the hour of the murder." "The prosecutor and the deputy attorney general who briefed this case have made no . . . argument [to that effect], probably for the obvious reason that, given the available evidence, it is meaningless without some insight into the relationship, if any, between the victim and Perez. The deputy district attorney, for example, suggested to the jury that defendant may have been allowed in to use the telephone. The time of the crime is a neutral factor in the present equation."

[12]It is noted here that ". . . Intent to kill does not equal premeditation. Second degree murder and voluntary manslaughter both require the intent to kill. But premeditated murder is held to be considerably viler on society's list of proscribed acts. There is no disputing that Victoria Mesa's killer intended the result; but what was the motive? What planning was involved? No one but Perez knows; that is the rub."

most were not.[13] He, of course, could not say where the second weapon came from; and there was no evidence of any double-edged knives in the kitchen. The deputy district attorney argued Perez had a second knife with him, *not* that he retrieved it from the kitchen.

"Moreover, Perez was badly cut himself. Some of those wounds could have resulted from his use of the blade from the broken knife during the attack. Also, he could have had some sort of knife on his belt, which would have been consistent with his occupation in the building trades, and used it without reflection in a frenzied combat with a spunky, resisting victim. What little we know is even compatible with the theory that *she* attacked him with the kitchen knife and he turned it against her. This would be consistent with the facial beating inflicted upon her. All this, like the theories advanced by the prosecution . . . , is speculation. It is offered, not to explain what probably happened, but to illustrate the gaps in the evidence on the premeditation issue.

"In discussing the second knife theory, it is appropriate to return to the recent decision in *People* v. *Wharton, supra*, [53] Cal.3d [522]. Wharton killed his paramour by inflicting heavy blows to the head with a hammer and stuffing her in a plastic bag. The exact cause of death was in doubt because the body decomposed before it was found. As noted earlier in footnote [4], four members of the Supreme Court thought premeditation was sufficiently shown, based in part on the trial prosecutor's theory that the hammer had been planted in the house beforehand or obtained from the garage for a murderous purpose during a struggle. ([53 Cal.3d] at p. [547].) There is less here.

"Kitchen knives are kept in the home, hammers usually in the garage. A small point, seemingly, but remember the prosecutor in *Wharton* had a dual theory. The hammer might have been hidden in the house before the killing. Much was made of the presence of such a tool in the home itself. Kitchen knives do not lend themselves nearly as well to such an argument.

"Even if the defendant did obtain two knives from the victim's kitchen, there is no way of knowing how many trips were involved. He could have taken both at the outset as a precaution against what appears may have happened, i.e., that a weak steak knife would prove an inadequate weapon. By contrast, the existence of the hammer and its usual place in a garage

---

[13]It is noted here that ". . . Without knowing where and when the second knife came from [*sic*], its possible existence is of little use to prove premeditation. The deputy district attorney, at least, understood that. The Attorney General . . . do[es] not; [he] employ[s] the second knife in an attempt to meet the substantial evidence standard with imagined scenarios suggesting premeditation. That is, of course, improper."

toolbox were at least established in *Wharton.* While there apparently was a second knife here, we do not know where it came from; not even the deputy district attorney or the Attorney General can agree on that. As plausible as any theory is that both participants produced knives during this encounter and the victim was wounded by each of them. The prosecution was at pains to show that the victim was a fighter. What is more likely than that she would have armed herself in her own kitchen? Why would it have been necessary to batter her face with blows from a fist if defendant had a weapon at the outset and she did not? The two knife theory, while it has some foundation in the evidence, is simply too insubstantial to support a finding of premeditation, notwithstanding *Wharton.*

"The *Wharton* majority also found credible evidence of motive: '[D]efendant sold some of [the victim's] belongings after her death and there was evidence from which the jury could have reasonably inferred that defendant was also stealing [from her] *before* her demise.' ([53 Cal.3d] at p. [547, italics in original].) The court added, 'The prosecutor invited the jury to conclude that [the victim] must have known about the prior thefts of her property because she was so quick to conclude defendant had stolen her car.' (*Id.* at p. [548].) There was no comparable proof of motive here.

"*Wharton* held, 'Although the manner of killing was not indicative of a preconceived design to kill ([*People* v.] *Lucero* [(1988)] 44 Cal.3d [1006], 1020 ["multiple blows to the skull from a blunt instrument [is not very] suggestive of premeditated murder"]); appellate courts sustain verdicts of first degree murder where there is evidence of motive in conjunction with planning activity. [Citation.] We thus conclude there was sufficient evidence to support the jury's verdict that defendant premeditated and deliberated the killing.' ([53 Cal.3d] at p. [548].) The proof of motive and planning activity was close to nonexistent here.

"*Wharton* is also distinguishable because the majority severely understated the evidence of motive and planning activity for some unexplained reason. Justice Broussard's dissent tells us the most damning evidence of premeditation came from defendant's alienist. Wharton sought help because he was obsessed with killing the victim, and kill her he did. The determination of premeditation is often a mind reading exercise. There was no need for that in *Wharton* after the jury learned of his psychological counseling.

"The Attorney General's parting shot centers on Perez's conduct after the killing: his failure to summon aid, his attempt to arrange the crime scene to mislead, and his lies to the nurse and police. Despite the contrary language in *Anderson* (*ante,* fn. [10]), *some* conduct after a murder can prove premeditation. A payoff to a hit man after the killing will do that nicely, so might

cashing in a large life insurance policy recently purchased without the victim's knowledge. But mere flight or other efforts to avoid capture where one is culpable to some degree in a homicide do not necessarily suggest the killing was premeditated. (*People* v. *Anderson, supra,* 70 Cal.2d at p. 32.)

"Persons involved in second degree murders are no less likely to adopt evasive tactics than those who planned the crime from the outset. The penalty is unpleasant in both cases. Nothing more occurred here than what might be expected in *either* situation. Defendant attempted to cover his vile deed; that is for sure. But what is lacking on this record is any proof of motive or planning. The finding of premeditation is not supported by substantial evidence and must be reversed accordingly." (Italics and bracketed material in original except for citation references and fns. omitted.)

The majority, however, conclude to the contrary. Their reasoning is unpersuasive.

To begin with, the majority find fault with the analysis set out in Justice Crosby's opinion. That discussion, they say, "disregard[s] settled principles of appellate review." (Maj. opn., *ante,* at p. 1126.) Not so.

The analysis below asks the right question, viz., whether a rational trier of fact could have found premeditation and deliberation *beyond a reasonable doubt*—not whether it could have done so to a degree of confidence less than the requisite "near certainty" or "evidentiary certainty."

The analysis below also adopts the right focus, viz., the evidence *in its entirety*—not isolated facts favorable to the challenged verdict.

Considered as a whole, the record tells one reasonable tale. Defendant and the victim had an undisclosed friendship. As she was attempting to conceive a child through artificial insemination with donor sperm, the victim terminated the relationship. Around that time, defendant began driving past her house frequently. On the day in question, he went to the house and entered without force. There was soon a confrontation. Defendant started to beat the victim with his fists. She took up a knife. In the ensuing struggle, he sustained defensive wounds to his hands. He got hold of the knife, stabbed her, and broke the weapon. He seized another knife. In the meantime, she died. He proceeded to stab her now-dead body. He searched through the house for some item or items that might betray his identity. He then fled.

The majority impliedly charge that the analysis below focuses on the evidence, as it were, "too late." They are wrong in their criticism, as the

extensive discussion quoted above demonstrates. Moreover, they are in no position to make such criticism in the first place. They themselves focus on the evidence hardly at all, whether "early" or "late." How else to explain the fact that they display virtually no recognition of the "personal" character of the incident?

To be sure, the analysis below takes special account of the prosecutor's summation. But it does so for reasons of which only defendant might legitimately complain. One is fairness—and perhaps, over-fairness—to the People. Justice Crosby explained: "[I]f there is an explanation for a finding of premeditation, it should be" in the prosecutor's argument. Another is deference to this court. Justice Crosby noted: ". . . *People* v. *Wharton*, *supra*, [53] Cal.3d at [pages 547-548,] makes it perfectly clear that the prosecution theory is the first place to look in the analysis."

The majority next attempt to undermine the precedential value of *Anderson*. "The *Anderson* guidelines," they say, "are descriptive, not normative." (Maj. opn., *ante*, at p. 1125.) Of course, "guidelines" are normative *by definition*.

The majority then declare that the rule of *Anderson* is satisfied here. Their assertion does not bear scrutiny.

Here, there is no substantial evidence that defendant planned an attack on the victim. Indeed, the record is essentially devoid of "facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing . . . ." (*People* v. *Anderson*, *supra*, 70 Cal.2d at p. 26, italics in original.)

The majority purport to find some evidence of planning in five "facts": (1) defendant "did not park his car in the victim's driveway" (maj. opn., *ante*, at p. 1126); (2) he "surreptitiously entered" the house (*ibid.*); (3) he "obtained a knife from the kitchen" (*ibid.*); (4) he took up a "second knife" after the initial attack (*id.* at p. 1127); and (5) he engaged in certain conduct "*after* the stabbing, such as the search of dresser drawers, jewelry boxes, kitchen drawers and the changing of a Band-Aid on his bloody hand, [which] would appear to be inconsistent with a state of mind that would have produced a rash, impulsive killing" (*id.* at p. 1128, italics in original).

The first "fact" must be deemed of minimal weight. There is no indication that defendant drove his car to the location in the first place. In any event, it is difficult to treat defendant's conduct as disclosing any intent to kill, less still a *premeditated* and *deliberate* intent.

The second "fact" is somewhat different. I shall assume for argument's sake that there is, in fact, a reasonable inference that defendant entered the house "surreptitiously." In passing, however, I emphasize what Justice Crosby discerned: "there was no evidence at all that Perez entered unlawfully or uninvited"; indeed, the prosecutor himself "suggested to the jury that [he] may have been allowed in to use the telephone." But here too, it is difficult to treat defendant's assumed "surreptitious" entry as disclosing any intent to kill, less still a *premeditated* and *deliberate* intent.

The third "fact" is similar to the second. There may indeed be a reasonable inference that defendant picked up the knife in the kitchen. But in Justice Crosby's words, "[t]here is, of course, no way of knowing . . . ." It may then be conjectured that defendant took the weapon with a mind to murder. Such speculation, however, depends on further speculation. Was the victim in the house at the time? If so, did defendant know she was? A bare intent to kill may perhaps be discerned—but not a *premeditated* and *deliberate* intent.

The fourth "fact" is more insubstantial still. Here too, there may indeed be a reasonable inference that defendant took up a second knife after the initial attack. It may then be conjectured, as Justice Crosby stated, that he "either brought it with him or obtained it from the kitchen to finish off the victim. Maybe, but who knows? And, if he did bring it in the form of a knife he ordinarily carried during working hours, what does that prove about premeditation?" Be that as it may, this "fact" shows only that defendant might have formed a premeditated and deliberate intent to kill *after* he struck the fatal blows. *By that time, the victim was dead.* Hence, the requisite concurrence of act and intent (see, e.g., *People* v. *Daugherty* (1953) 40 Cal.2d 876, 901-902 [256 P.2d 911]) was absent. One cannot be guilty of murder if he harbors the requisite mens rea but commits the actus reus against a corpse.

The fifth "fact" disproves itself. Defendant's conduct after the attack, which can most generously be described as "rash" and "impulsive," shows that the attack itself must be characterized in similar terms. The conclusion might be different if defendant had immediately fled the scene. But as the majority are compelled to admit, he did not.

Next, there is no substantial evidence that defendant had a motive to kill the victim. Again, the record is essentially devoid of "facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim . . . ." (*People* v. *Anderson, supra,* 70 Cal.2d at p. 27, italics in original.)

The majority purport to find some evidence of motive in a commonplace witness-elimination theory. Surely, the evidence allows speculation in this

regard—as it does in absolutely every murder case. But it simply does not support a factual inference to that effect. Again, speculation is not evidence, less still substantial evidence. All the same, in Justice Crosby's words, "[t]he desire to eliminate a witness only shows intent to kill, *unless* there is evidence to suggest it was entertained before the fatal attack." (Italics in original.) No such evidence exists here. The majority's implication that defendant might have developed a motive suggesting premeditation and deliberation *after* the initial attack is insufficient as a matter of law. As noted, by that time the victim was dead; hence, the requisite concurrence of act and intent was absent.

Finally, there is no substantial evidence that defendant employed a manner of killing the victim that reveals forethought and reflection. The record is weak as to "facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of" planning or motive. (*People* v. *Anderson, supra,* 70 Cal.2d at p. 27, italics in original.) One need look no further than the fact that the victim suffered *dozens* of knife wounds—but not *one* to a vital organ.

The majority purport to find some evidence of a manner of killing revealing forethought and reflection in the fact that blood was discovered in the kitchen knife drawer—a fact that assertedly "supports an inference that defendant went to the kitchen in search of another knife after the steak knife broke." (Maj. opn., *ante,* at pp. 1126-1127.)

Had blood been found in that drawer *and nowhere else,* the evidence might perhaps seem weighty, at least at first glance. Such a situation would arguably suggest that after the initial attack, defendant conceived a "design" "to take his victim's life in a particular way . . . ." (*People* v. *Anderson, supra,* 70 Cal.2d at p. 27.) On further scrutiny, the evidence would reveal itself to be insubstantial. A "design" conceived after the victim's death would have been conceived too late to satisfy the requirement of concurrence of act and intent.

But in actuality, blood was found not only in the kitchen knife drawer, but virtually everywhere throughout the house. The situation that the facts unambiguously disclose points toward a killing done spontaneously and impulsively in unchecked and undiscriminating fury—certainly without "design," "preconceived" or otherwise.

In view of the foregoing, a rational trier of fact could not have found defendant guilty beyond a reasonable doubt of willful, deliberate, and premeditated murder.

Put simply, premeditation and deliberation were not established to a "near certainty" or to an "evidentiary certainty." The record does not reveal that defendant formed an intent to kill "on preexisting reflection" "resulting from careful thought and weighing of considerations." True, the evidence supports an inference that he did indeed intend to kill. But intent to kill *simpliciter* is not enough. (See *People* v. *Anderson, supra,* 70 Cal.2d at p. 26.)

Certainly, the case does not come within the *Anderson* rule. There is no evidence of planning *together with* motive *together with* manner. Neither is there extremely strong evidence of planning. Finally, there is no evidence of motive *together with* either planning *or* manner.

## V

For the reasons stated above, I conclude that the evidence is insufficient to support defendant's conviction for willful, deliberate, and premeditated murder. It is plain, however, that the record facts are more than adequate for a second degree murder conviction.

I would therefore affirm the judgment of the Court of Appeal.

**KENNARD, J.,** Dissenting.—I agree with Justice Mosk that the evidence in this case is insufficient to support defendant's conviction of murder in the first degree. The facts of this case are not significantly different from those of *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], in which this court reversed the defendant's first degree murder conviction because there was insufficient evidence to establish that defendant committed the murder with premeditation and deliberation. As in *Anderson,* there is no evidence here either of planning or a preexisting motive to kill, and the manner of killing does not suggest the " 'careful thought and weighing of considerations for and against' " the killing that defines a premeditated and deliberate murder. (Maj. opn., *ante,* p. 1123.) I would therefore affirm the judgment of the Court of Appeal, which reduced defendant's conviction from first to second degree murder.

Appellant's petition for a rehearing was denied September 24, 1992. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.