Filed 4/30/14  P. v. Johnson CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>COREY LAMAR JOHNSON et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B244298<br>(Super. Ct. Nos. 2010010522, 2012031111)<br>(Ventura County) |

Brian Bilal Starks appeals the judgment entered after a jury convicted Starks of first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189), assault with a firearm (§ 245, subd. (a)(2)), and possession of a firearm by a felon (former § 12021, subd. (a)(1)).  The jury also found true allegations that Starks personally inflicted great bodily injury in committing the murder and personally discharged a firearm causing death (§§ 12022.7, subd. (a), 12022.53, subd. (d)).[2]  Starks subsequently admitted

---

[1] All further undesignated statutory references are to the Penal Code.

[2] Starks was also charged with conspiracy to commit robbery with an attendant personal firearm use allegation (§§ 182, subd. (a)(1), 211, 12022.53, subd. (b)).  The jury deadlocked on the charge, and it was ultimately dismissed.

suffering a prior strike conviction and serving a prior prison term (§§ 667, subds. (c)(1), (e)(1), 667.5, subd. (b), 1170.12, subds. (a)(1), (c)(1)).  The trial court sentenced him to 75 years to life in state prison.

Starks' codefendant Corey Lamar Johnson appeals the judgment entered after he pled guilty to being a felon in possession of a firearm (former § 12021, subd. (a)(1)), and conspiracy to sell cocaine (§ 182, subd. (a)(1); Health & Saf. Code, § 11352, subd. (a)).[3]  Johnson also admitted prior strike and prison term allegations, and further admitted as to the conspiracy count that he personally was armed with a rifle (§ 12022, subd. (c)).  He was sentenced to 13 years in state prison.[4]

Starks contends (1) the court erred in denying his *Batson/Wheeler*[5] motion; (2) the evidence is insufficient to support his murder conviction; and (3) the court violated his right to counsel during jury deliberations.  Johnson's appointed counsel has filed an opening brief raising no issues in accordance with *People v. Wende* (1979) 25 Cal.3d 436.  In a supplemental letter brief, Johnson asserts a violation of his speedy trial rights.  We affirm.

STATEMENT OF FACTS

*Prosecution*

On November 8, 2009, Michael Wade and Darell Babagay drove to Matthew Dunigan's house in Rancho Cucamonga seeking to buy cocaine and marijuana. Dunigan was there along with Kenneth Pecaro and Tracey Mitchell.  Pecaro called Starks, whom he knew from their time together in prison, and asked if he had 10

---

[3] Johnson was also charged in the counts of which Starks was convicted, but a mistrial was declared after the jury deadlocked on all counts.

[4] A third codefendant, Terrance Morrow, was charged with conspiracy to commit robbery, murder, and assault with a firearm.  The jury convicted him of the assault, but deadlocked on the remaining counts.  After mistrial was declared as to the deadlocked counts, Morrow pled guilty to the conspiracy count and great bodily injury and firearm use allegations.  The trial court sentenced him to 11 years in state prison.  Morrow filed a notice of appeal, but his request to dismiss the appeal was subsequently granted.

[5] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

2

kilograms of cocaine for sale.  Starks said he could get three and a half kilograms of cocaine for $19,000 a kilogram.  Starks eventually lowered the price to $17,500 a kilogram and offered to transport the drugs to Rancho Cucamonga for an additional $8,000.

After a discussion, it was decided that Pecaro would drive to Oxnard the next day and meet up with Starks to "check it out," and then Dunigan, Wade and Babagay would show up with the money.  The following morning, Pecaro met up with Starks at a Wendy's restaurant in Oxnard.  Starks told Pecaro the transaction would take place either at a house or an auto shop and that "it would be as easy as going to buy a couple packs of smokes."

Pecaro called Dunigan and said, "Come on down.  We're ready to go."  Wade and Babagay picked up Dunigan and the three of them drove to Oxnard.  During the drive, Dunigan said they would be purchasing a kilogram of cocaine for $18,000 or $18,500.

Dunigan, Wade, and Babagay met with Pecaro at an Oxnard Wendy's.  Pecaro, who was acting "crazy" and appeared to be under the influence of drugs, approached Babagay and repeatedly asked, "You got the money?"  Babagay was beginning to feel uneasy about the situation, so he went outside and called his brother on a pay phone.  Wade came out of the restaurant and Babagay told him he no longer wanted to go through with the deal.  Pecaro, who appeared to be under the influence of drugs, approached Wade and Babagay and once again asked whether they had the money.  Babagay told Pecaro not to worry about the money.

Pecaro called Starks, who gave him directions to a 7-11 store in Oxnard.  Babagay drove Pecaro and Wade to the 7-11, while Dunigan stayed at the Wendy's.  During the 10- to 15-minute drive, Pecaro asked Babagay about the money four or five more times.  Babagay and Wade both assured Pecaro that "the money's fine."

Several minutes after Babagay, Pecaro, and Wade arrived at the 7-11 store, Starks arrived in a black station wagon.  Pecaro approached Starks and was told they needed to go to another location to get the cocaine.  It was agreed that the cocaine would

3

be tested before any money exchanged hands and that the price would be $18,500 per kilogram.

Pecaro walked back to Babagay's car and said, "You better have the money." Babagay and Pecaro walked back to Starks' vehicle and Pecaro introduced the two men to each other. Starks was acting "really cold" and did not return Babagay's greeting, which prompted Babagay to tell Pecaro, "I'm not doing this." Babagay returned to his car, and Wade told him he was going to "go take a look." Pecaro walked back to Babagay's vehicle and asked if he intended to go forward with the purchase. Babagay said yes and gave Wade a drug test kit containing gloves, a razor knife, and a magnifying glass. Pecaro and Wade got into Starks' vehicle and drove away with him.

At about 2:25 p.m., Starks parked in an alley behind a house on E Street in Oxnard. Starks asked Wade and Pecaro if they had any weapons, and both men said they did not. Wade and Pecaro followed Starks down the alley to an iron gate. Starks opened the gate and led them to a door. Pecaro opened the door and rushed inside. Pecaro was immediately confronted by codefendant Morrow, who pointed a semiautomatic handgun at Pecaro's head. Pecaro grabbed Morrow by his hands and pulled him outside, causing Morrow to fall. During the struggle, Pecaro was shot in the right hand. Another man armed with a rifle, subsequently identified as Johnson, appeared and told Morrow "[w]e got to go." At that point, Johnson and Morrow both ran away.

Pecaro got up and walked out to the alley, where he found Wade lying shirtless on the ground with gunshot wounds. Pecaro continued walking toward the spot where they had parked and saw Starks drive away. Pecaro then walked to a store across from the 7-11 and called Dunigan, who was still at the Wendy's restaurant.

Pecaro was hiding in the bushes waiting for Dunigan to pick him up when he was approached by Oxnard Police Detective Lucy Buttell. Detective Buttell asked Pecaro if he was hurt. Pecaro showed the detective his bleeding hand and said he had fallen while being chased by some men. Pecaro was transported to the hospital for treatment of his injuries. He was subsequently transferred to jail on various parole violation charges.

4

The police responded to the scene of the shootings and found Wade lying face down on the ground in a pool of blood. Wade told the police he was shot with an "automatic gun" by a Black man wearing a black or red shirt and Levi's jeans. Wade also said there were "three people" who "tried to rob us." Wade subsequently died as a result of his injuries.

The police found Wade's shirt in the alley along with two spent .40-caliber casings, a black bag, a razor knife, and a magnifying glass. Inside the black bag were two baggies containing a substance later determined to be hashish, and three baggies containing methamphetamine and heroin. A folding knife was found just outside the door Pecaro had entered.

Sometime between 2:00 p.m. and 5:00 p.m. that same day, Johnson and Morrow arrived at Morrow's mother's apartment. Morrow's brother Jermaine Jones was there along with his younger sister and family friend Victor Lee. Johnson and Morrow were both "[k]ind of hyped up." Morrow took off the jersey he was wearing, put it in a bag along with a black baseball cap and some other items, and gave it to Jermaine[6] to throw away. Jermaine left the apartment to throw the bag away, and returned wearing the baseball cap. Morrow told Jermaine to throw the cap away as well, and he complied.

Lee noticed that Morrow had a scratch on his hand between the thumb and index finger. Morrow said he got the scratch when his gun jammed during a struggle with someone over $70,000. The prosecution's firearms expert testified that Morrow's injury was consistent with a "slide bite," which occurs when a gun's slide moves back as it is fired. Lee also overheard Morrow talking on his cell phone and asking, "Is everything cool?" and "Did you get anything?" After the phone call, Morrow told Lee that someone "got shot in the ass."

Johnson had his rifle bag and asked Lee if he wanted the rifle. Lee said yes, then wrapped the rifle in a sweater he got from Jermaine. Later that day, Lee threw the rifle away in a dumpster a couple of blocks from the apartment. Later in the evening,

---

[6] Because Jermaine and witness Jahmani Jones have the same last name, we refer to both men by their first names.

Lee met up with his friend Jahmani and told him about the rifle. Jahmani said he wanted the rifle, so Lee retrieved if from the dumpster and gave it to him. The police subsequently recovered the rifle while executing a search warrant at the residence of Jahmani's girlfriend.

The police executed a search warrant at the E Street house that same night. While searching the bedroom that Pecaro had entered, officers found a backpack containing seven rounds of .380 ammunition in a magazine and eight additional rounds of ammunition in a box. A handgun holster was found in another bedroom.

Sometime after the shootings, Morrow asked Lee to hold a small black gun for him. On November 28, 2009, Lee was a passenger in Phillip Gamble's truck when the truck was subjected to a traffic stop. The gun Lee had received from Morrow was found inside the truck. A records check of the gun's serial number revealed that the gun had been reported stolen in September 2009. DNA found inside the barrel of the gun matched Pecaro's profile as the major contributor and Lee's profile as the minor contributor. DNA found on the grip of the gun matched the DNA profiles of Lee, Morrow, and Gamble.

An autopsy revealed that Wade suffered gunshot wounds to his left lower back or flank and his right buttock. The wounds were consistent with a conclusion that Wade was facing away from the shooter and was possibly ducking during the first shot, and was starting to fall or run away during the second shot. Wade also had a laceration on the top of his head that could have been caused by "some part of a gun." Toxicology tests revealed low levels of methamphetamine, opiates, hydrocodone, and cannabanoids.

*Defense*

Starks testified on his own behalf. He admitted he had been dealing drugs since he was 13 or 14 years old and that he sold cocaine and crack cocaine. In 2005, he was sent to prison and met Pecaro. He was released on parole in November 2008.

On the day of the incident, Pecaro called Starks and asked if he could get some cocaine. Starks said he could do so, and arranged to pick up three or four bricks of cocaine from his prior drug contact. The following morning, Starks called Pecaro and

6

told him that each one-kilogram brick would cost $17,500. Starks picked up the drugs and went to his mother's house for a family gathering. He subsequently received a call from Johnson suggesting that the transaction take place at the house on E Street. It was understood that Johnson would be compensated for providing the location.

Starks left his mother's house and drove to the house on E Street. As he was walking up the alley toward the house, he saw Morrow near the gate. The two of them walked past the gate and Morrow went to the back room of the house while Starks stayed outside. Pecaro called Starks and told him not to "try any stupid shit" because Pecaro had been robbed a few days earlier. Starks told Johnson what Pecaro had said. Johnson replied, "I can get a gun" and added, "but I don't think it works."

Starks drove to the 7-11 parking lot and met with Pecaro. Babagay did not want to complete the transaction but Pecaro and Wade ultimately decided to go with Starks. As they were about to get into Starks's car, Babagay called out to Pecaro and handed him a razor and an item that appeared to be a gun in a holster. Pecaro and Wade also had gloves and a magnifying glass.

Starks drove to the house on E Street and parked in the alley. Pecaro asked where the drugs were and Starks pointed toward the back room of the house. The three men walked through the iron gate and into the backyard. Pecaro ran into the house and got into a physical struggle with Morrow. Starks heard a gunshot. He and Wade both tried to escape through the gate but bumped into it. Starks fell to the ground, while Wade began reaching for something in his pockets.

Wade brandished the razor and repeatedly said, "I'll kill you." Believing he was about to be killed or injured, Starks pulled out a .40-caliber gun he had gotten from his drug distributor and "shot in front of [himself]" without aiming. Starks dropped the gun, then picked it up and ran away. Wade was still standing at the time. As Starks was backing up in his car, he saw Pecaro looking at him and Wade lying on the ground.

Starks drove home and left the gun and drugs inside his car. He then called Morrow and Johnson to check on them, learned they were okay, and drove his other car to his nephew's house.

7

Johnson also testified. On the day of the incident, Morrow called him and said that Starks had people coming from out of town and wanted to know if he could use Johnson's motel room for a drug deal. Johnson eventually told Starks he could use the house on E Street. Johnson expected to be paid for providing the location.

Johnson bought a rifle and brought it to the house on E Street because he knew Morrow was bringing a gun and had heard that Pecaro and his friends would also be armed. Johnson was waiting in the den when Pecaro and Wade arrived. After hearing what sounded like a gunshot, he went to the back door. As he was walking outside, he heard two more gunshots and saw Morrow and Pecaro fighting and Wade crying out for help. Johnson separated Morrow and Pecaro and Pecaro ran away. Johnson and Morrow then left together in Johnson's car.

DISCUSSION

*Appellant Starks*

I.

*Batson/Wheeler*

Starks contends the trial court erred in overruling his *Batson/Wheeler* objection to the prosecutor's use of peremptory challenges against three Hispanic prospective jurors. Starks, who is African-American, claims that the potential jurors were excused in violation of his federal and state constitutional rights. We conclude otherwise.

L.M. and L.G., both of whom are Hispanic, were among the first 12 prospective jurors called to the jury box. Following voir dire, the prosecutor exercised her first peremptory challenge against prospective juror A.B., and her second against L.G. The prosecutor subsequently exercised her third and fourth peremptory challenges against L.M. and prospective juror T.M., an African-American.

During a recess, Starks joined in a *Wheeler* motion brought by Johnson's attorney, who argued "[t]here . . . appears to be what I believe is a systematic elimination of minorities. It appears that . . . the prosecution's last three peremptory challenges were

8

. . . juror [L.G.], juror [L.M.], and now the only black [*sic*] is juror [T.M.]."  The court told the prosecutor, "I don't believe there's been a prima facie case, but I think the prudent thing to do is if you want to make any record [*sic*]."  The prosecutor explained that T.M. was excused because he had a felony conviction for possession of a controlled substance and had served 11 months in prison as the result of numerous probation violations.  T.M., who was 33 years old and unemployed, also gave answers indicating "that he would rather be here th[a]n out looking for a job."  The prosecutor offered that "the drug conviction along with his age, his lack of stability, his lack of real ties to the community are the reasons that I struck him."  The prosecutor was not prepared to comment on her peremptory challenges of L.G. and L.M. because she did not have her "notes from the people [sh]e kicked yesterday[.]"  The court replied:  "I'll let you look at your notes if you want to make a record on any other peremptories that you used.  But I denied the motion. I don't think there's a prima facie case."

After the prosecutor exercised her seventh and eighth peremptory challenges against prospective jurors J.C. and C.C., Johnson asserted "a continuation of a *Wheeler* motion, an exclusion of minorities."  Counsel noted that J.C. was Hispanic and stated that Johnson thought C.C. was "mixed [B]lack."  The court denied the motion "out of hand" and added, "It's clear why she excused [J.C.].  And [C.C.] appeared to be white and is 19 years old, and [the prosecutor] told her I'm gonna excuse you 'cause you're too young.  So right off the bat, we know why.  So I don't think that there's any basis."

After the 12 jurors and 4 alternates were selected, the prosecutor stated her reasons for exercising peremptories against L.M. and L.G.  During voir dire, L.M. revealed he had been a juror in a prior criminal case and had voted along with the rest of the jury to acquit.  The prosecutor "was really appalled and embarrassed" by the case because L.M.'s description of the defendant's alleged conduct "didn't sound like a crime to [her]."  The way L.M. described the case led the prosecutor to believe that "my office might be tainted in his view for having brought such a petty crime and that's the reason I kicked him."  L.G. was excused because she "seemed . . . to be very soft-hearted based on" her work with the Ventura County Public Health Department Community Outreach.

9

The prosecutor explained: "I wrote a note on there that I was gonna kick her based on the questionnaire, and then when she said, 'I tend to give people the benefit of the doubt,' and I just thought that this is gonna be a case involving ugly, serious facts, and I thought she might be a little bit too soft-hearted for me and that's why I kicked her."

Starks' attorney stated that he continued to join in Johnson's motion and added, "I'm not sure about the soft-heartedness being quite legitimate, but I would say there did seem to be a pattern developing." The court replied: "Well, I ruled that I didn't see it, and I knew [T.M.] wasn't gonna stay based on his answers in his questionnaire . . . . So I didn't find any improper basis for this. I was surprised when I actually heard the motion. That's why it was denied."

The motion was properly denied. A defendant claiming that peremptory challenges have been used to remove jurors based solely on group bias such as race must first "'. . . ". . . make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" [Citation.]' [Citations.]" (*People v. Battle* (2011) 198 Cal.App.4th 50, 59 (*Battle*).) When the trial court denies a *Batson/Wheeler* motion on the ground that no prima facie case was made, we consider the record of the voir dire with "considerable deference" to determine whether the evidence supports the court's ruling. (*Id.* at p. 60.) Under this standard, we will affirm if the record suggests grounds upon which the prosecutor might have reasonably challenged the juror or jurors in question. (*Ibid.*) Even when no prima facie case has been established, the prosecutor's proffered reasons for exercising the peremptory challenges may demonstrate a legitimate, race-neutral reason for having so acted. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 723-724.)

Here, the motion was properly denied under the first prong because Starks failed to identify a cognizable group upon which a *Batson/Wheeler* motion may be based. Counsel asserted that the prosecutor was engaging in the "systematic elimination of minorities." Our Supreme Court has recognized that such a generalized grouping of minorities is insufficient to trigger a *Batson/Wheeler* inquiry. (*People v. Davis* (2009) 46 Cal.4th 539, 583 ["At the outset, we reject defendant's contention that the trial court erred by ruling that 'people of color' is not a cognizable group for *Wheeler* analysis. No California case has ever recognized 'people of color' as a cognizable group"].) Starks' belated attempt to identify Hispanics as the group upon which his challenge was based is unavailing. In any event, counsel's "meager" showing—consisting of the prosecutor's use of only five out of 36 possible peremptory challenges—was insufficient to support an inference of purposeful discrimination. (See *People v. Taylor* (2010) 48 Cal.4th 574, 642-643 [evidence was insufficient to create inference of discrimination where "defense counsel relied solely on the fact the prosecutor had exercised three of her 10 peremptory challenges to excuse two African-American prospective jurors and one Hispanic prospective juror"].)

Moreover, the prosecutor gave legitimate, nondiscriminatory reasons for each of the disputed peremptory challenges. In arguing otherwise, Starks essentially invites us to disregard the standard of review, which requires us to give deference to the court's ruling and affirm if the record suggests grounds upon which the prosecutor could have reasonably brought challenges for cause. (*Battle, supra*, 198 Cal.App.4th at p. 60.) During voir dire, prospective juror L.M. was critical of a prior criminal trial on which he sat as a juror and agreed with the prosecutor that the charge against the defendant was "incredibly petty." L.M.'s expression of a prior negative experience with the criminal justice system provided a race-neutral ground for the prosecutor to challenge him. (*People v. Roldan* (2005) 35 Cal.4th 646, 703, overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22; *People v. Calvin* (2008) 159 Cal.App.4th 1377, 1386.) Prospective juror L.G.'s background in social services provides a race-neutral reason for her exclusion. (*People v. Clark* (2011) 52 Cal.4th 856, 907;

11

*People v. Watson* (2008) 43 Cal.4th 652, 677.) Finally, the race-neutral justification for prospective juror J.C.'s exclusion lay in the fact that he previously served as a juror in a criminal case that resulted in a hung jury (*People v. Farnam* (2002) 28 Cal.4th 107, 138), as well as his expressed frustration with the legal system arising from his belief that his nephew had been unfairly prosecuted (*ibid.*). In light of these facts, Starks' *Batson/Wheeler* motion was properly denied.

## II.

### *Sufficiency of the Evidence*

Starks claims the evidence is insufficient to support his conviction of first degree murder. He argues that the conviction must either be reversed or reduced to second degree murder or voluntary manslaughter.

In reviewing claims of insufficient evidence, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) Our review is the same in a prosecution primarily resting upon circumstantial evidence. (*People v. Watkins* (2012) 55 Cal.4th 999, 1020.) We do not reweigh the evidence or reassess the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) We accept the logical inferences that the jury might have drawn from the evidence although we would have concluded otherwise. (*Streeter*, at p. 241.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.)

Starks was prosecuted for first degree murder on two different theories, i.e., premeditated and deliberate malice murder and felony murder committed in the course of a robbery. Under the former theory, "'[d]eliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the

12

extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ."  [Citations.]'  [Citation.]"  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*); *People v. Perez* (1992) 2 Cal.4th 1117, 1123–1124 (*Perez*).)

Our Supreme Court held that evidence sufficient to sustain a finding of premeditation and deliberation may include evidence of planning and motive and the manner in which the killing was committed.  (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27.)  These categories are merely descriptive guidelines to our analysis and are neither exclusive nor exhaustive.  (*Koontz, supra*, 27 Cal.4th at p. 1081; *Perez, supra*, 2 Cal.4th at p. 1125.)  Moreover, there is no requisite minimum length of time between the prior reflection on killing a person and taking action to commit the killing.  (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)  "'. . . Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .'  [Citations.]"  (*Perez, supra*, at p. 1127.)

Here, a reasonable jury could find that Starks acted with premeditation and deliberation when he shot and killed Wade.  Evidence of planning is found in the fact that Starks armed himself with a gun.  (See *People v. Steele* (2002) 27 Cal.4th 1230, 1250 ["As to planning, the jury could infer that defendant carried the fatal knife into the victim's home in his pocket, which makes it 'reasonable to infer that he considered the possibility of homicide from the outset'"].)  The manner of killing, in which Starks shot Wade multiple times at close range in the back as he was trying to escape, also supports a finding of premeditation and deliberation.  (*People v. Thompson* (2010) 49 Cal.4th 79, 114-115.)  Indeed, this evidence relating to the manner of killing is sufficient by itself to sustain a finding of premeditated and deliberate murder.  (See *People v. Memro* (1995) 11 Cal.4th 786, 863-864.)  Conflicting inferences that might be drawn from this evidence are irrelevant to our analysis.  (*People v. Albillar, supra*, 51 Cal.4th at p. 60.)

The evidence was also sufficient to support a conviction under the theory of felony murder.  Under the felony murder doctrine, a killing is first degree murder whether or not intentional or premeditated when it is committed in the perpetration of certain

13

enumerated felonies, including robbery.  (§ 189; *People v. Lindberg* (2008) 45 Cal.4th 1, 27.)  The requisite mental state is the specific intent to commit the underlying felony, not the intent to kill.  (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.)  Felony murder does not require a strict causal relationship between the underlying felony and the homicide provided the killing and the felony are part of one continuous transaction.  (*Id.* at pp. 197-198.)

The evidence is sufficient to support a finding that Starks and his codefendants planned to commit a robbery, and that Starks killed Wade in the course of that robbery.  Starks, an experienced drug dealer, arranged to sell cocaine at a discounted price.  Moreover, Starks remained in constant communication with Johnson and Morrow in the hours leading up to the crime, and all three men obtained guns shortly before the crime was carried out.  Starks also sought to ensure that Wade and Pecaro were unarmed. Moreover, Starks fraudulently induced Pecaro to enter the house where the crime occurred by falsely telling him that the drugs were in a back room of the house.  When Pecaro entered the house, Morrow immediately put a gun to his head, indicating that they were planning to rob him rather than complete a drug transaction.  Morrow was later overheard asking Starks if he "[got] anything," and told Lee that he had injured his hand during a struggle for $70,000.  When the police asked Wade what happened, he said he had been shot because Starks "tried to rob us."  Pecaro also expressed his belief that Stark and his codefendant "wanted to rob [them]."  In light of this evidence, the jury could find Starks guilty of first degree murder on the theory that he killed Wade during the perpetration of a robbery.

Starks argues that we cannot deem the evidence sufficient to support a conviction of felony murder because the jury was unable to reach a verdict on the charge of conspiracy to commit robbery as to all three codefendants.  As the People note, any inconsistency arising from this fact provides no basis for us to disregard the evidence that is sufficient to support a conviction of felony murder.  (See *People v. Palmer* (2001) 24 Cal.4th 856, 858, 860.)  Moreover, the trial court implicitly found a factual basis for a

14

conviction of conspiracy to commit robbery when it accepted Morrow's guilty plea to the charge.  (See *People v. Palmer* (2013) 58 Cal.4th 110, 118-119.)

*Sixth Amendment Right to Counsel*

Appellant contends the trial court violated his Sixth Amendment right to counsel when it held a hearing to discuss a jury question outside the presence of his attorney, Deputy Public Defender Gay Zide, and submitted a response to the question without any input from her.  He claims the court should have granted his motion for a new trial on that basis.  We are not persuaded.

Ex parte communications between the judge and the jury are not permitted unless the prosecutor and defense counsel consent to the communication.  (*People v. Bradford* (2007) 154 Cal.App.4th 1390, 1413.)  "The rule against private communications between the judge and jury concerning any question from the jury ""is based on the precept that a defendant should be afforded an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection or suggest a different reply more favorable to the defendant's case.""  [Citation.]  When the jury's inquiry arises in a situation where 'counsel could have taken some action on the defendant's behalf to amplify, clarify, or modify the supplemental instruction or procedure,' a 'court's failure to give notice or afford an opportunity to respond [to the jury's inquiry] . . . constitute[s] statutory as well as constitutional error.'  [Citation.]"  (*Ibid.*)

During deliberations, the jury submitted a note asking for "further instruction/clarification because we are currently deadlocked on counts 1 [murder] & 2 [conspiracy to commit robbery]."  A hearing was held in the presence of counsel at which the parties agreed to return the note to the jury with the question, "Can you be more specific about what instruction or clarification you desire?"  The jury sent another note requesting "Clarification on procedures for Count 1, conspiracy to commit robbery.  Can we move to Count 2 without agreement on Count 1, for or against.  [¶]  Clarification on the definitions of each proposed murder charge."

15

After another unreported hearing that Zide did not attend, the parties agreed on the following response, which was in the prosecutor's handwriting: "1) Yes. You may consider all the counts in any order you want. [¶] 2) The choices for Count 2 are: [¶] -1st Degree Felony Murder as to all three defendants; [¶] -1st or 2nd Degree Malice Murder as to Mr. Starks only[;] [¶] -2nd Degree (Natural & Probable Consequences) Murder as to all three defendants[;] [¶] -Voluntary Manslaughter as to Mr. Starks only[;] [¶] -Not Guilty[.] [¶] [] You must [] make individual de[c]i[s]ions as to each defendant. Please refer to the instructions for specific definitions[.]"

At a hearing regarding another jury note the following day, Zide stated that she was not present at the previous hearing because she was in another courtroom making an appearance in another matter. She did, however, discuss the response to the jury question with the prosecutor and codefendants' counsel as they all sat in the hallway outside the courtroom. After taking "a brief look" at the response, counsel recalled stating that she was "going to have an objection" and added, "I did not authorize [Johnson's attorney] to lodge any objection for me. I assumed that I would be called before that answer to the question was going to be sent in. [¶] Now I know there are no jury instruction numbers, but there are page numbers, and I would have looked more closely at what got sent in. [¶] So I'm lodging an objection to that . . . ." Johnson's attorney then explained to the court: " I wrote you a note that said that [Zide] wants to have the page numbers, and so she objects to that, and that the three of us, [the prosecutor, Morrow's attorney] and myself would allow you to send in what it is, and that just preserved her objection for her. [¶] So I did alert the Court that she objected to that procedure." Zide replied, "I wanted to look at what went in, though, and I never got a chance to look at the final version." The court noted Zide's objection and added, "I did know you wanted the page numbers, and I didn't do anything about page numbers. They didn't ask that."

After Starks was convicted, he moved for a new trial claiming, among other things, that his right to counsel had been violated when his attorney was deprived of the opportunity to approve the final response to the jury's questions regarding counts 1 and 2.

16

Zide submitted a declaration stating she had merely "glanced briefly at the partial proposed response by the district attorney" and had "asked to be called before the answer went in to the jury." Zide also offered that she would have objected to the response being written in the prosecutor's handwriting.

In opposing Starks' new trial motion, the prosecutor asserted that "counsel [for Starks] was advised on and agreed to any and all responses that the court gave to the deliberating jury either in person or by way of having counsel for the other defendants stand in for her temporarily." In a supplemental declaration, the prosecutor stated that all counsel, including Zide, had met in the courtroom antechamber and hallway and had spent about 45 minutes discussing the proposed response. During that time, Zide was going in and out of another courtroom pursuant to her calendar assignment. Zide, however, "was present and participating in the conversation" and viewed both the question and the proposed response. Zide also agreed to have Johnson's attorney standing in for her to accommodate her courtroom schedule. After they agreed on a final draft of the response, Johnson's attorney took the draft and went to confer with Zide. When he returned, he said he would stand in for Zide and appear on behalf of Starks. In support of the prosecutor's declaration, Johnson's attorney submitted a declaration stating that "there was discussion between all attorneys as to a possible answer." Johnson's attorney also stated, "It is possible I did appear for [Zide] as a courtesy as she was engaged in another Court." In a reply to the prosecutor's opposition, Zide filed a declaration stating she had "no recollection of either seeing or being asked to discuss" the jury's question and the proposed response.

At the hearing on the new trial motion, the prosecutor reiterated she had no "doubt in [her] mind that . . . [Zide] was present and participating in every single discussion" and that Johnson's attorney appeared for Zide at the hearing on the matter. After hearing arguments, the court addressed Zide as follows: "Well, this is fairly troubling, 'cause it's pretty sloppy unfortunately. But I do have, although I can't say a precise memory, a fairly good memory of how this all played out." The court then stated that it recalled Zide conferring with the other attorneys in the antechamber. The court

17

also recalled Johnson's attorney conveying Zide's objection to the response in that she "want[ed] the page numbers identified to this question." The court noted the objection at the time, but declined to give page numbers because the jury did not ask for them; moreover, the response instructed the jury to "go back and read all the other instructions to get the definitions for what we're talking about." To the extent Zide claimed that she had other objections, the court found credible Johnson's attorney's assertion no such objections were raised. The court also found it irrelevant that the response was in the prosecutor's handwriting because the jury would have had no reason to know who wrote it. Finally, the court concluded that any objections as to the form of the response would have been overruled and that the response gave a "completely neutral answer that . . . doesn't pinpoint any different individual defendant. The fact [is] that Mr. Starks had more theories of culpability than the others. That's just what the law is. So if it was error, I find it harmless beyond a reasonable doubt 'cause that's the answer that would have gone in. So the motion for new trial is denied."

Starks' motion was properly denied. In reviewing the motion, we must refer to the trial court's factual findings to the extent they are supported by substantial evidence. (*People v. Cua* (2011) 191 Cal.App.4th 582, 609.) Here, substantial evidence supports the court's credibility findings that Zide (1) fully participated in the discussions on the proposed response to the jury's questions; (2) had the opportunity to state any objections she had to the proposed responses; and (3) agreed to have Johnson's attorney stand in for her at the hearing and appear on Starks' behalf; and (4) interposed no objection to the form or substance of the response, other than to request that the jury be directed to the page numbers of the instructions for which clarification was sought.

The evidence also supports the court's finding that any error occasioned by the incident was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Jennings* (1991) 53 Cal.3d 334, 383-384 [unauthorized ex parte communications between the judge and jury are subject to the *Chapman* harmless error standard of review].) As the court found, the response was neutral and did not favor either side. Although Starks' name was the only name mentioned, the response would not have been complete without

18

it given the charges brought against him.  It is simply irrelevant that the response was in the prosecutor's handwriting, for the jury would have no reason or means of knowing this.  Moreover, Starks fails to explain how a different response might have led to a different result in his favor.  He claims the response was prejudicial in that it failed to specifically refer the jury to the instructions it sought to clarify, yet fails to explain how this is so.  The response does not, as he claims, "simplistically reduce[] several complex theories of murder to a single sentence," but rather offers clarification of the other instructions relating to those theories.  His complaint that the response "failed to define first degree murder as premeditated murder" is unavailing because this is made clear in the other instructions, to which the jury was expressly referred.  To the extent he complains the response erroneously gave the jury the option of convicting him of second degree murder on a natural and probable consequences theory, we fail to see how he was prejudiced by the possibility that the jury may have believed it could convict him of this lesser charge.  It necessarily follows that any error was harmless beyond a reasonable doubt.  (*Chapman, supra*, at p. 284; *Jennings, supra*, at pp. 383-384.)

### *Appellant Johnson*

We appointed counsel to represent Johnson in his appeal.  After examining the record, counsel filed an opening brief raising no issues and requesting that we independently examine the record pursuant to *People v. Wende, supra,* 25 Cal.3d 436.  We subsequently advised Johnson in writing that he had 30 days within which to personally submit any contentions or issues he wished to raise on appeal.  In a timely response, Johnson contends the trial court violated his statutory and constitutional rights to a speedy trial.  This claim does not provide an arguable issue for our review.  "[T]he cases are virtually uniform in holding that a claim of speedy trial violation—whether statutory or constitutional—does not survive a guilty plea.  [Citations.]"  (*People v. Hernandez* (1992) 6 Cal.App.4th 1355, 1357; *People v. Egbert* (1997) 59 Cal.App.4th 503, 512.)  Johnson offers nothing of substance that would warrant a departure from that rule.

19

Having examined the entire record, we are satisfied that appointed counsel has fully complied with his responsibilities and that no arguable issues exist. (*People v. Kelly* (2006) 40 Cal.4th 106, 123–124; *People v. Wende, supra*, 25 Cal.3d at p. 441.)

DISPOSITION

The judgments are affirmed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

20

Charles W. Campbell, Judge

Superior Court County of Ventura

_____

Kim Malcheski, under appointment by the Court of Appeal, for Appellant Starks.

California Appellate Project, Jonathan B. Steiner, Richard B. Lennon, under appointment by the Court of Appeal; Corey Johnson, in pro. per., for Appellant Johnson.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, William H. Shin, Deputy Attorney General, for Respondent.