Filed 4/28/25  P. v. Valdovinos CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B337142 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA129026) |
| v. | |
| RYAN ANGEL VALDOVINOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Victor Martinez, Judge.  Affirmed.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jonathan M. Krauss and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

In the early morning hours of November 16, 2021, defendant Ryan Angel Valdovinos killed Richard Abrao by stabbing him eight times while Abrao was sleeping on a sidewalk outside a strip mall. A jury convicted Valdovinos of one count of first degree murder. (Pen. Code, § 187, subd. (a).)[1] Valdovinos argues we must reverse the conviction because there was insufficient evidence to support the jury's finding that he acted with premeditation and deliberation. He also contends we must vacate the trial court's order requiring him to pay $370 in fines and fees because the court abused its discretion in determining he has the ability to pay them. We disagree and affirm, as we explain below.

## FACTS AND PROCEEDINGS BELOW

The evidence against Valdovinos came primarily from two sources: surveillance video from a nearby business that did not capture the murder but showed Valdovinos's movements just before and after it; and statements by Priscilla Henriquez, who lived in the La Puente neighborhood where the killing occurred, spent the evening with Valdovinos, and told sheriff's department detectives she saw him stab Abrao. Henriquez invoked her Fifth Amendment privilege against self-incrimination and did not testify at trial, but the prosecution introduced a recording of her interview with the detectives, as well as a transcript of her testimony at the preliminary hearing.

Henriquez and Valdovinos spent several hours together on the night of the murder. At some point after 4:00 a.m., she told

---

[1] Unless otherwise specified, subsequent statutory references are to the Penal Code.

him that she was tired and her head was hurting.  The two sat down on a planter bed facing the sidewalk in front of a donut shop.  A homeless man, later identified as Abrao, was lying down asleep nearby with his belongings, including a bicycle.  There was no evidence that Valdovinos had ever met Abrao before.

Henriquez stated that she stood up and started walking down the sidewalk heading back toward her home, which was nearby, when Valdovinos took Abrao's bicycle.  The surveillance video shows Valdovinos walking with the bicycle and leaving it beside a chain-link fence in front of a vacant lot two stores away from the donut shop.  Valdovinos told Henriquez to "Get the bike," and the surveillance video shows her jogging toward the chain-link fence and picking it up.  Henriquez told police that she turned and saw Valdovinos walk up to Abrao, who was still asleep, and stab him at least twice.[2]  According to Henriquez, Valdovinos did not tell her what he was going to do in advance, nor did he interact with Abrao at any point prior to the stabbing.  Abrao did nothing other than make moaning noises when he was stabbed.  The surveillance video shows Valdovinos sprinting back toward Henriquez, and the two continue together away from the scene of the stabbing.

Henriquez told police that she asked Valdovinos what he had done, and Valdovinos said, "Just be quiet and walk away," and "Come on, let's go."  Valdovinos took the bike back from Henriquez and started riding it.  Henriquez caught up with him, and they went back to Henriquez's house.

---

[2] At the preliminary hearing, Henriquez denied seeing Valdovinos stab Abrao.

A neighborhood resident encountered Abrao's body within two hours. A medical examiner performed an autopsy and determined that Abrao had been stabbed eight times, and that the cause of death was homicide. Two of the stab wounds would have been fatal in themselves, including one wound through the heart and another to the lateral torso. The remaining wounds, to Abrao's right shins and left hand, were shallower and not fatal. The wounds to Abrao's hands appeared to be defensive.

At around 11:00 a.m. the same morning, sheriff's deputies encountered Valdovinos a few blocks away from the scene of the stabbing. Valdovinos was riding Abrao's bicycle, but he abandoned it in the middle of the road and walked away from it. Deputies detained Valdovinos and found dried blood on the jacket he was wearing, as well as on gloves that they found in Valdovinos's pockets. Criminalists performed DNA tests on the blood found on the jacket and gloves, and on the drawstring of Valdovinos's pants, and determined that the samples matched with Abrao. In addition, DNA tests of samples obtained from the handles of the bicycle matched Valdovinos and Henriquez as well as Abrao. The authorities did not recover the murder weapon, but approximately three hours before the murder, a deputy searched Valdovinos after stopping him on an unrelated matter and found a knife in his waistband.

A jury convicted Valdovinos of first degree murder, and the trial court sentenced him to 25 years to life in prison.

4

## DISCUSSION

### A. Substantial Evidence Supported the Conviction of First Degree Murder

Valdovinos contends we must reverse his conviction for first degree murder because there was insufficient evidence that he acted deliberately and with premeditation in killing Abrao.

"Our task in deciding a challenge to the sufficiency of the evidence is a well-established one. '[W]e review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . .' [Citation.] ' "An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. [Citation.]" ' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 811-812.)

The People charged Valdovinos with first degree murder on the theory that the killing of Abrao was "willful, deliberate, and premeditated." (§ 189, subd. (a).) "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse. [Citations.]" (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

The seminal case interpreting those terms is *People v. Anderson* (1968) 70 Cal.2d 15, in which our Supreme Court described factors relevant to a finding of premeditation and deliberation. The *Anderson* guidelines are " 'neither normative nor exhaustive, and . . . reviewing courts need not accord them any particular weight' [citation]" (*People v. Rivera* (2019) 7

5

Cal.5th 306, 324), but they serve "as a framework to aid in appellate review." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

After surveying prior cases on the subject, "the *Anderson* court identified three categories of evidence pertinent to the determination of premeditation and deliberation." (*People v. Perez, supra*, 2 Cal.4th at p. 1125.) These are evidence of planning, or "facts about how and what [the] defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing"; motive, or "facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim"; and the manner of the killing, or in other words, "facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way." (*People v. Anderson, supra*, 70 Cal.2d at pp. 26-27, italics omitted.)

Valdovinos argues that there is no evidence of any of these factors. He notes that during closing arguments, the prosecutor described the murder as "a crime of opportunity," and proposed no motive for the crime, admitting that "[w]e don't know why this necessarily happened." In addition, Valdovinos argues that the brutal nature of the killing was "consistent with a sudden, random 'explosion' of violence" (*People v. Alcala* (1984) 36 Cal.3d 604, 626) and "cannot alone support a determination of premeditation." (*Ibid.*)

We are not persuaded. The amount of reflection required to support a finding of premeditation and deliberation "need not span a specific or extended period of time. ' " 'Thoughts may

6

follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " ' [Citation.]" (*People v. Stitely, supra*, 35 Cal.4th at p. 543.) In particular, the concept of planning for purposes of a finding of premeditation and deliberation does not imply a well thought out design: " '[P]lanning activity occurring over a short period of time is sufficient to find premeditation.' [Citation.] . . . [W]hat matters . . . is the extent of the defendant's reflection on his actions, not its *duration*. [Citations.]" (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 493.)

This may have been a crime of opportunity, but a jury could reasonably find that when the opportunity presented itself, Valdovinos acted not on " ' " 'unconsidered or rash impulse' " ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88), but according to a plan. The surveillance video shows that the sequence of events from the theft of the bicycle to the flight after the murder took approximately one minute and 45 seconds. A jury could reasonably infer that, at the very latest, Valdovinos must have formed the intention to kill when he set the bicycle down by the chain-link fence. Considered in the light most favorable to the judgment, there was no other reason at that point for Valdovinos to stop, order Henriquez to take the bicycle, and then walk back past two storefronts toward the still-sleeping Abrao if Valdovinos did not mean to commit murder. "The utter lack of provocation by the victim is a strong factor supporting the conclusion that [the] attack was deliberately and reflectively conceived in advance." (*People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102.) Additionally, Valdovinos repeatedly stabbed his victim, for a total of eight times including one strike directed at Abrao's heart. Such repeated "wounds inflicted on an unarmed and defenseless

7

victim that posed no threat to [the] defendant [are] entirely consistent with a premeditated and deliberate murder." (*People v. Silva* (2001) 25 Cal.4th 345, 369; see also *People v. Harris* (2008) 43 Cal.4th 1269, 1287 [sufficient evidence to support deliberation and premeditation where the defendant did not kill the victim immediately upon encountering her, and then "stabbed [her] without provocation directly in the heart"].)

## B. The Trial Court Did Not Abuse Its Discretion in Imposing $370 in Fines and Fees

At the sentencing hearing, the trial court imposed a $300 restitution fine (§ 1202.4), a $40 court operation assessment (§ 1465.8), and a $30 criminal conviction fee (Gov. Code, § 70373). In addition, the court imposed a $300 parole or post-release community supervision fine (§ 1202.45) but suspended the imposition of the fine pending the completion of parole or community supervision.

The statutes on which these fines and fees are based "either preclude, or do not require, an ability-to-pay determination" (*People v. Petri* (2020) 45 Cal.App.5th 82, 89), but in *People v. Dueñas* (2019) 30 Cal.App.5th 1157, the court held that "imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution." (*Id.* at p. 1168, fn. omitted.) Subsequent cases have diverged on whether the court's analysis in *Dueñas* was correct (compare *People v. Kopp* (2019) 38 Cal.App.5th 47, 95 [agreeing in part with the *Dueñas* analysis], review granted Nov. 13, 2019, S257844, with *Petri*, *supra*, at pp. 90-92 [rejecting *Dueñas*]), "and the issue is currently before the California Supreme Court" (*Petri*, *supra*, at p. 90).

8

Valdovinos's sentencing hearing took place in 2024, more than five years after *Dueñas*, but Valdovinos did not object to the imposition of the fines or claim he was unable to pay them. The court stated that it had "considered his ability to pay. With the time he is serving, he can make those payments through prison wages, so the court is declining to waive any of these fees."

Valdovinos now contends the court abused its discretion, and that there is no basis for concluding he could pay the assessments from his prison wages. He cites a 2018 report from the state Legislative Analyst's Office indicating a low rate of employment among prisoners (Legis. Analyst, The 2018-19 Budget: Governor's Criminal Justice Proposals, pp. 9, 14, at <https://lao.ca.gov/reports/2018/3762/2018-19-crim-justice-proposals-022818.pdf> [as of Apr. 23, 2025]), as well as the very low wages paid for prison labor (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1)), and calculates that, at the lowest pay rate, he would need to work 9,500 hours to earn enough to pay off the assessments.

We agree with the People that Valdovinos forfeited his claim by failing to object that he was allegedly unable to pay before the trial court. "Once caselaw exists holding that a hearing on ability to pay is constitutionally required when requested, a defendant who does not object or ask for a hearing forfeits the claim of error." (*People v. Evers* (2023) 97 Cal.App.5th 551, 556.) Because Valdovinos did not contest the issue of ability to pay, there is no evidence in the record regarding his financial circumstances.

Valdovinos now asks us to find he cannot pay without information that would have been present had he objected before the trial court. Well-settled forfeiture rules prevent us from

9

doing so. Further, the information Valdovinos now relies on for his argument is incomplete and outdated. The report he cites regarding unemployment in prison is seven years old, and we can only speculate on the likelihood that Valdovinos will find a job in prison. Valdovinos also claims that he may earn as little as $0.08 per hour if he obtains employment in prison, but that is not the case. Effective April 16, 2024, prison wage rates have doubled. (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1), Register 2023, No. 40-Z (Oct. 6, 2023) pp. 1314-1316, amended Apr. 16, 2024, Off. of Administrative Law, No. 2024-0304-02, Notice of Approval of Regulatory Action, at <https://www.cdcr.ca.gov/regulations/wp-content/uploads/sites/171/2024/04/Inmate-Pay_Approval.pdf> [as of Apr. 23, 2025].)

Although the wages remain extremely low by ordinary standards, Valdovinos would need to work 4,625 hours, or just over two years of full-time employment at the new minimum wage of $0.16 per hour, to pay off his assessments in full.[3] Furthermore, the Legislature recently enacted section 1465.9, which alleviates the burden on prisoners by automatically invalidating the unpaid balance of all restitution fines after 10 years. (See § 1465.9, subd. (d), enacted in Assem. Bill No. 1186 (2023-2024 Reg. Sess.) (Stats. 2024, ch. 805, § 1).) The restitution fine constitutes the bulk of the amount of the assessments in this case. After 10 years, Valdovinos will be responsible only for any unpaid balance on the remaining $70 in fees.

---

[3] This calculation assumes Valdovinos pays one-half his wages toward his assessments. The Department of Corrections and Rehabilitation is required to deduct one-half of prisoners' wages toward the payment of restitution fines. (§ 2085.5, subd. (a).)

## DISPOSITION

The judgment of the trial court is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

BENDIX, Acting P. J.

M. KIM, J.

11